[No. 7,428.—In Bank.]
October 9, 1882.

# THE CITY OF NAPA *v.* A. Y. EASTERBY ET AL.

61   509
108   264

61   509
122   545

61   509
134   251

ESTABLISHING GRADES IN CITY OF NAPA—MUNICIPAL CORPORATION—STREET ASSESSMENT—STATUTORY CONSTRUCTION—MUNICIPAL ORDINANCES—PUBLICATION OF ORDINANCES—EVIDENCE.—The Act to reincorporate the City of Napa was approved February 24, 1874.  Sections of the Act were amended March 29, 1876, and again amended April 1, 1878.  The proceedings were to collect a street assessment.  The plaintiff "read and put in evidence" without objection ordinances of the Board of Trustees of the City of Napa Nos. 42, 74 and 77.  Ordinance No. 42 was adopted December 7, 1874, Ordinance No. 74, September 19, 1878, and Ordinance No. 77, January 23, 1879.  As they purport to be recited in the bill of exceptions, they adopt and recognize the "grade and sewer maps and system of grading and sewerage represented on said maps and accompanying diagrams," prepared and reported by W. P. Humphreys as the "official system of grades and sewerage of the City of Napa," etc.  Section 9 of the City Charter provides: "The Board of Trustees *shall cause to be published* in some newspaper in the city all ordinances which shall be certified and signed by the president and clerk of the board, and no ordinance shall take effect and be in force until ten days from the first publication thereof."  "A copy of such ordinance published or purporting to have been published by authority in the official newspaper of the city shall be *prima facie* evidence, that such ordinance has been regularly and legally passed and authenticated, and that the provisions of the ordinance are as published, and that such ordinance was published by the order of said Board of Trustees at the date when said publication purports to have been made."

*Held:* 1. An ordinance, *res ipsa*, although it may have no binding effect until after appropriate publication, is a different thing from its publication; and the Court cannot infer that it was properly published because it was passed, nor does the provision of the charter above recited make the ordinance itself any evidence of the newspaper publication.  2. If it should be admitted that the Court should presume that the ordinances and their publication were proved below by the newspaper copy, the Court can not, in the absence of the evidence of the publication, say when they took effect, or that they were in force when the proceedings were taken which were the foundation of this action.  3. The requirement of the charter that the Board of Trustees "shall cause to be published," all ordinances, means that the board shall order the publication; and, notwithstanding the subsequent clauses of Section 9 of the charter, the Court can not, in the absence of the notice or publication, determine the date when the publication purports to have been made; nor is the oral testimony of a witness that the ordinance was published sufficient to show that the publication was made by order of the Board; the charter makes a copy of the order published by authority, etc., alone presumptive evidence that the ordinance was published by order of the board.  4. In this case, as presented,

it does not appear either what was the order of the Board of Trustees, or that the publication, if made at all, was made in accordance with any order of the board.

CONSTRUCTION OF CHARTER, MODE THE MEASURE OF THE POWER.—*(Per* McKINSTRY, J., MORRISON, C. J., and THORNTON, J.) Construing, as must be done, all of the provisions of the charter of the City of Napa together, there appears the evident purpose that the adjacent property shall pay for the establishment of the grade, and that the power to establish the grade shall be employed only by an ordinance assessing the charge thereof upon the property fronting upon the street, or portions of the street where the grade is established, and that such grades would become established only when (at least) assessments had been levied upon the property liable to be assessed therefor.

*Held :* As the case shows not only that such assessment was not ordered, but that on the contrary the person, whose system of grading and sewerage was adopted as the official system, was, contrary to the provisions of the charter, paid for his services out of the City Treasury, it follows that the official grade has never been established.

FINDING CONTRARY TO THE EVIDENCE.—The finding of the Court that the grade of the street, on which was done the work for which the assessment mentioned in the complaint was made, had been and was duly established, etc., is not sustained by the evidence.

APPEAL by defendant from the judgment of the Superior Court of the County of Napa, and from an order denying a motion for a new trial. WALLACE, J.

Action to enforce a street assessment. The facts are stated in the opinion of the Court. After the decision a petition for a rehearing was presented and denied.

*B. S. Brooks* and *Wm. Leviston,* for Appellants.

The first thing to be considered is the establishment of a grade. This is claimed to have been done by old Ordinance 42, passed in 1874, and Ordinance 77, passed January 23, 1879. The last is an admission of its own necessity, and of the invalidity of 42.

The proceedings in 1874 were these: August 17, 1874, Humphreys presents a proposition to survey the city and report a system of grades. August 19th, a resolution was passed by the board to employ him (this was not singed, passed or published as an ordinance, nor was there any petition, remonstrance or notice of intention). November 9, 1874, Humphreys presented his report, and, December 7,

1874, Ordinance No. 42, adopting the grade thus reported, was passed by the Board.

We deny the validity of the ordinance: There was no authority conferred upon the Board of Trustees by the charter to employ an engineer to recommend a general system of grades for the whole city. It is true that Section 11, which contains a general specification of the powers of the Board, among them mentions: "Third—To establish the grade of all streets, avenues and alleys, and to require and enforce conformity thereto." But the whole Act is to be construed together, and this section is to be construed to mean, "in the manner hereinafter directed."

Such a proceeding is necessarily at the expense of the whole city, and Section 18 declares that "the City of Napa shall not pay for establishing the grades." This is not intended to forbid the city from paying for work authorized by her, but to withhold from her the power to authorize the establishment of the grades of the streets by a general ordinance and at the general expense. This purpose is consistent with the system of street improvements devised and provided by the Act which makes each block a case, and the owners of that block judges of the necessity or policy of the improvement. It would be absurd to say that the city could lawfully do this thing, but could not lawfully pay for it.

Having declared that the city may establish grades, but forbid her to do it at the common expense, it proceeds by the next section (19) to provide how it shall be done. "When the owners of more than one half in frontage of the property fronting on any street between two cross streets shall desire to have the grade established, and shall petition in writing," the power of the Board is set in motion. Sections 20 to 29 provide what proceedings shall then be taken, and Section 30 provides how the Board may proceed without petition; and shall proceed in letting contracts and in assessing the expenses of such work in the same manner as in cases of assessments made upon petition, and provides further that where they estimate that the work shall cost more than fifty dollars they shall give notice of intention, etc.

We claim that the only effect of this is to substitute the resolution of the Board for the petition of property owners,

and all other proceedings are to be the same, and the restriction to a single block applies as well to this proceeding as the one instituted by the owners, and this strengthens the conclusion that the Board had no power to establish by one act the grade of the whole city.

But it will be noted that Section 30 does not give any power to establish grades, but to grade, fill, plank, pave, etc. It would not be a reasonable construction which would hold that they could by one ordinance, and without any petition, pave or plank the whole city and assess the cost on all the lots according to their frontage, while proceeding upon petition they could establish the grade of one block only. But it is said that this section in 1874 was not so limited. That section was certainly different, but I think did not give any such power. It was as follows:

"The Board of Trustees may at any time, without petition, provide for establishing grades, and for constructing and laying down drains, sewers and culverts, and for repairing streets, avenues and alleys, or portions thereof, so as to render them susceptible of convenient use, and shall proceed in assessing the expenses of such work upon the property chargeable therewith as hereinbefore provided; and in enforcing the same in the same manner as in cases of assessments made upon petition."

It will be observed that this is one sentence, and we contend that the whole is qualified by the words, "so as to render them susceptible of convenient use," else why are those words inserted? If the power was to establish a system of grades for the entire city or a permanent grade, it was unnecessary to insert those words, and they are unmeaning, nor would that be necessary in order to effect the object—to render them susceptible of convenient use. The power granted goes no further than that, and must be taken in connection with the actual state of affairs—a town site sloping gently to the river, having a natural sufficient drainage. The establishing of a grade or laying of drains, culverts, etc., to render the streets susceptible of convenient use, would be a trifling matter. It will be observed that in this section as it stood in 1874, no power was given as in the present section (30) to provide "for grading, filling, planking, paving, macadamizing or graveling," all

of which was authorized by Section 19 to be done upon petition. This work is to be assessed upon the property chargeable therewith as hereinbefore provided, that is to say, upon each block in proportion to the frontage. If the power to establish grades were general and unlimited, these provisions are senseless.

I think it is evident from the language of the Act that the Board of Trustees had no power in 1874, without petition, to establish a system of permanent grades for the whole city. That the power given to proceed without petition was only to do such trifling temporary street work as was necessary "to render them susceptible of convenient use, and then to be assessed upon each block."

These sections secure to the citizen that the city shall not have the power to improve him out of his property. This is done by assuring the operation of this general principle—that each block is a separate case and the improvement cannot be made without the consent of the owners of two thirds thereof.

It is unnecessary to examine in detail here the requirements of these sections, because it is not pretended that they were followed, or attempted to be in any respect.

An examination of these sections of the Act (Sections 18 to 30 inclusive) we think will satisfy the Court that these two schemes exhaust the power of the Board in respect to street improvements, and declare and define the mode in which alone its power can be exercised.

That the Act treats each street between two cross streets as a separate case, and the rights of the owners cannot be changed by bringing into the adjudication more parties. By universal custom, and in accordance with Constitutional requirement, in all matters of street improvements, the property-owners affected are allowed a voice. The establishing the grade is the radical step from which all the others necessarily follow, and if the property-owner is not allowed to intervene in that he is remediless.

So unusual a course cannot be attributed to the Legislature in the absence of an express declaration. The Trustees are not selected because of their skill in engineering. Whenever

CAL. REPS. LXI—33

it is desired to establish a general system of grades, it is usual for the Legislature, upon application of the city, to create a Board of Engineers especially for that purpose. Survey of minute accuracy is then had, and due notice given, and abundant opportunity given for contesting and amendment; but in this case no notice whatever was given, or required to be given, at any step in the proceedings.

*W. F. Henning,* for Respondent.

Each block does not constitute a case, upon which the city must act independent of all other blocks, and in separate proceedings. We submit that Section 19 of the Charter, as it stood in 1874, or as it stood in 1879, in no respects limits any proceeding to a single block. The word is only used once in the section, and that is in providing for the expense of improvements where streets cross each other, which expense shall be borne by the quarter blocks upon the two streets.

The section places no limit upon the number of persons who may petition, nor upon the quantity of frontage which they may represent, unless it may be said to mean that not less than a block shall be improved at a time. The object of the law is to improve the entire street, or so much of it as may need improvement. As counsel has seen fit to construe this section in connection with Section 30, I shall maintain that neither expressly nor by implication do they, as thus construed, place any restriction upon the length of street which may be ordered to be improved, without petition. The safeguard of the property-holders is in remonstrance.

The powers conferred in Section 11, to establish the grade of all streets, and to require conformity thereto, and to provide for drainage and sewerage, and to pass such orders, resolutions and ordinances as they may deem necessary to carry these powers into execution, fully justifies the Board in establishing a general system of grade drainage and sewerage. That these provisions have reference to a general system, and not to the act of determining separately and at different times the height or grade of particular streets, walks, or sewers, as may in some instances be required when improvements are to be made.

The action contemplated in Section 18 clearly refers to the

act of improvement—the ascertaining of the relation which a particular place bears to the general system. This expense of ascertaining this relation, together with the expense of the improvement are to be assessed to the owner.

If each block is a case—if but one block can be improved at a time, or by one distinct proceeding, the plan of improvement, which necessarily extends over a number of years, would lead to irregularities and injuries more distressing than any defendant imagines he now suffers.

It is hardly necessary to consider the language of Section 30 as it stood in 1874. This action is based upon proceeding instituted in 1879, together with Ordinance 74, and when Section 30 read as it reads now.

The first clause, and Subds. 2, 3, 4, and 10 of Section 11, were the same in 1874 that they are now. Even without these several specifications, the power to establish a general system of grade, drainage and sewerage would be incident to the general power of the city to control its own streets and preserve the health of its inhabitants.

Notwithstanding the many objections raised by counsel to Ordinance 42, it appears that the ordinance was found and produced in evidence. It is *prima facie* evidence that it has been regularly and legally passed and authenticated. (Section 9 of Charter.) So far as the Transcript enlightens us, counsel for defendant did not attempt to show that it was not so authenticated, recorded and published. It was published December 12, 1874. In his points and authorities counsel for defendant says, that "there is produced a publication in a newspaper." In connection with the testimony of Walden, and the admission of counsel, this was enough to establish *prima facie* the validity of the ordinance under Section 9 of the Charter. The burden of showing its invalidity then devolved upon defendant, and his assertions made in his points and authorities can not supply the place of evidence which was essential at the trial.

McKINSTRY, J.:

The Act to reincorporate the City of Napa was approved February 24, 1874. Sections of the Act were amended March 29, 1876, and again amended April 1, 1878.

The bill of exceptions alleges that plaintiff " read and put in evidence " ordinances of the Board of Trustees of the City of Napa, Nos. 42, 74 and 77.

The ordinances, as they purport to be recited in the bill, adopt and recognize the " grade and sewer maps and system of grading and sewerage represented on said maps and accompanying diagrams " prepared and reported by Wm. P. Humphreys, as the " official system of grades and sewerage of the City of Napa," etc.

The bill of exceptions does not show any objection to the ordinances when they were offered.

Ordinance No. 42 was adopted December 7, 1874, Ordinance No. 74, September 19, 1878, and Ordinance 77, January 23, 1879.

Section 9, of the City Charter provides: " The Board of Trustees *shall cause to be published* in some newspaper in the city all ordinances which shall be certified and signed by the President and Clerk of the Board, and no ordinance shall take effect and be in force until ten days from the first publication thereof."

It is urged by appellant:

First.—Plaintiff failed to prove that the ordinances were published.

Second.—Plaintiff failed to prove that the Board of Trustees caused them to be published.

Section 9 of the City Charter proceeds: "A copy of such ordinance published or purporting to have been published by authority in the official newspaper of the city, shall be *prima facie* evidence that such ordinance has been regularly and legally passed and authenticated, and that the provisions of the ordinance are as published, and that such ordinance was published by the order of said Board of Trustees at the date when said publication purports to have been made."

It may be said that, inasmuch as no objection was made to the ordinances when offered, and as by Section 9 of the Charter, an ordinance may be proved, *prima facie,* by production of a copy purporting to be published by authority in the official newspaper, this Court, in support of the action of the Court below, will presume that Ordinances 42, 74 and 77 were thus proved. Further, inasmuch as the charter provides that

no ordinance shall take effect and be of force until after publication, they were not valid or effective ordinances unless published, and, consequently, the recital in the bill of exceptions that plaintiff "put in evidence" the ordinances, must be held to be a recital that the ordinances were duly published. But an ordinance, *res ipsa*, although it may have no binding effect until after appropriate publication, is a different thing from its publication. It may be proved by the original entry of it in the proper book, or perhaps by certified copy or from the printed volume of ordinances.

We are not authorized to infer that it was properly published because it was passed, and the provision of the charter which makes the newspaper publication evidence *prima facie* of the ordinance, does not make the ordinance itself presumptive, or any, evidence of the newspaper publication.

Even if it should be admitted, however, that we should presume the ordinances and their publication to have been proved below by the newspaper copy, we cannot say, in the absence of the evidence of the publication in the newspaper, when they took effect, or that they were in force when the proceedings were taken which are the foundation of this action. Section 9 provides that the production of the newspaper copy shall prove, *prima facie*, that an ordinance was published "at the date when said publication purports to have been made." We can only tell the date at which a publication purports to have been made from the publication itself.

The charter requires that the Board of Trustees shall "cause to be published" all ordinances. This means that the Board shall order the publication. (Temple, J., in *Chambers* v. *Satterlee,* 40 Cal. 521; *Donnelly* v. *Tillman,* 47 id. 41; *Donnelly* v. *Marks,* id. 191; *Himmelmann* v. *Satterlee,* 49 id. 387; *Reis* v. *Graff,* 51 id. 90.)

It is true, Section 9 of the Charter of the City of Napa provides that the newspaper copy of an ordinance shall establish, *prima facie,* that the ordinance was published by order of the Board, at the date when said publication "purports to have been made." But, in the absence of the notice or publication, we can not say what was its purport. It follows that, as the case is presented, it does not appear either what was the order of the Board of Trustees, or that the publication—

if made at all—was made in accordance with any order of the Board.

At a stage of the trial different from that at which the plaintiff "put in evidence" the ordinances above mentioned, plaintiff called J. E. Walden as a witness, who testified:

"I am foreman of the Napa *Reporter.*

"Q.—Was the Napa *Reporter* an official paper in 1874?

"Counsel for defendants objects as incompetent, etc.

"Witness—Ordinance No. 42 was published December 12, 1874."

This clearly shows that the Ordinance No. 42 was proved as an independent fact, and that the distinct fact of its publication was sought to be established by the oral testimony of the witness Walden; in other words, that the Ordinance 42, its contents and the regularity of its passage and adoption, and the order of the Board directing it to be published, were not proved by the production of a copy of the ordinance as published. But Section 9 of the Charter makes a copy of the order published by authority, etc., *alone* presumptive evidence of the matters therein mentioned, including the fact that the ordinance was published by order of the Board. The statement of a witness that the ordinance was published creates no presumption that it was published by order of the Board of Trustees. It follows again that the case does not show that the Board "caused to be published" the Ordinances 42, 74 and 77.

It does not appear, therefore, that the official grade has ever been established by any ordinance of the Board of Trustees.

But if it had been proved that the Ordinances 42, 74 and 77 had been duly published by order of the Board, the question would remain: Did the Board have power, by ordinance, to declare and adopt "an official system of grades" for the city of Napa?

Doubtless, it would seem more convenient to establish by one ordinance a system of grades having reference to a common level. It would also seem peculiarly proper that the Board of Trustees should have power to establish a symmetrical plan of grades for the whole city, irrespective of any application by property-owners. But an examination of the

charter—as the same read when Ordinances Nos. 74 and 77 were passed—will show not only that the Board had no power to establish a general system of grades, but the Board had no power to establish a grade for any portion of a street except upon petition of property-owners.

The seventh subdivision of Section 11 of the Charter reads: "The Board of Trustees are authorized and empowered *to establish the grade* of all streets, avenues and alleys, and to require and enforce conformity thereto." But the second subdivision of the same section empowers the Board "to provide for * * * working, grading, improving and repairing of streets, avenues and alleys," and no one would claim that this language is to be construed without reference to the subsequent provisions which provide the manner in which the power to "work, grade and improve" is to be exercised. The charter is to be read as a whole, and, in both instances, the mode is the measure of the power. Section 18, commences: "The City of Napa shall not pay for *establishing the grade*, grading, working, improving, or repairing streets, etc., but *all such expenses* shall be assessed upon the property fronting on such streets, avenues and alleys as hereinafter provided," etc.

Section 19. "When the owners of more than one half in frontage of the property *fronting on any street,* or portion thereof, between the center line of two cross streets, * * * shall desire *to have the grade established,* or to grade, fill, plank, etc., and shall petition the Board of Trustees in writing, asking that the same may be done, the Board may order said work to be done as requested, at the expense of the property fronting on said street," etc.

Section 20. "The Board of Trustees may at any time, without petition, * * * provide for grading, filling, planking, paving, macadamizing, or graveling streets, * * * or otherwise *improving or repairing* the same, and shall proceed in letting contracts and *assessing* the expense of such work upon the property chargeable therewith in the same manner as in cases of assessment made upon petition," etc. (Stats. 1877–78, p. 1017, Amendment took effect June 1, 1878.)

Thus appears the evident purpose that the adjacent property shall pay for the establishment of the grade, and that the power to establish a grade shall be employed only by an

ordinance assessing the charge thereof, upon the property
fronting on the street, or portion of street, where the grade is
established.

Not only so, but inasmuch as in every enumeration of
powers conferred upon the Board of Trustees, the power to
establish the grade is spoken of as a different thing from the
power to provide for *grading,* and as by Section 30, the power
to establish the grade, without petition, is not conferred upon
the Board, the Board of Trustees has no power, without peti-
tion, to provide for grading a street, until after the grade of
such street has been established *upon petition.* Certainly no
street can be graded until its grade has been established, and
its grade can not be established except upon the written peti-
tion of the owners of more than one half of the frontage.
(Section 18.)

We can not inquire whether this is the best system which
could have been adopted. It is the system found in the
charter.

It is true, Ordinance No. 42 was passed prior to the adoption
of the amendment of Section 30 of the City Charter found in
the Act which took effect June 1, 1878. When No. 42 was
passed, Section 30 read: "The Board of Trustees may at any
time, without petition, provide *for establishing grades*  *  *  *
and for repairing streets," etc. But in the same section it was
provided that the Board "shall proceed in assessing the ex-
penses of such work *upon the property chargeable therewith,*
as therein before provided."

When therefore Ordinance No. 42 was adopted, the Board
of Trustees had power to provide for establishing a grade
"without petition." But they could establish a grade only by
providing for the payment of the expense of its establishment
by means of assessments upon the property fronting upon
the street, or portion of street, where the grade was to be es-
tablished. The Board could order the work to be performed
"at the expense of the property fronting on said street, avenue
or alley, to be assessed upon in proportion to the number of
front feet of the several lots," etc. (Section 19.)

It is certain in no case would the grade be established until
the assessment had been ordered, or, at least, made. Reading
the several sections together it would seem evident it was

intended that, as a separate act, a grade should be established along a street, or a portion thereof, "between the center lines of two cross streets, or between the center line of a cross street and the terminus of a street." (Section 19.)

At all events, the assessment upon the adjacent property is part of the establishment of a grade. Even if it should be admitted, therefore, that, when Order No. 42 was passed, the Board had power by one ordinance (or "resolution," even,) to establish the grade of all streets, avenues and alleys within the corporate limits of Napa City, such grades would become "established" only when (at least,) assessments had been levied upon the property fronting upon all the streets, avenues and alleys.

The case shows, not only that such assessment was not ordered by the Board of Trustees, but that no such assessment was in fact made. On the contrary, it affirmatively appears from the record that the person whose "system of grading and sewerage" was adopted, and declared to be the "official system," was paid for his services out of the city treasury. This, although Section 18 of the Charter provides that "the City of Napa shall not pay for establishing the grade" of streets, and Sections 19 and 30 that property fronting upon a street shall pay for establishing its grade.

The Court below found: "6. That the grade of the street on which was done the work for which the assessment mentioned in the complaint was made, had been and was duly established at the time of the adoption of the resolution of intention hereinafter named."

From what has been said, it follows that the sixth finding is not sustained by the evidence.

Judgment and order reversed and cause remanded for a new trial.

MORRISON, C. J., concurred.

MYRICK and ROSS, JJ., concurred in the judgment on the first ground stated by McKINSTRY, J.

THORNTON, J., concurred on the second ground stated by McKINSTRY, J.