[Civ. No. 1370.  Third Appellate District.—October 15, 1915.]

EDWIN M. CHASE, Petitioner, v. F. J. KALBER, Town Clerk of the Town of Rio Vista, Respondent.

CONSTITUTIONAL LAW—SCOPE OF INITIATIVE AND REFERENDUM—LEGISLATIVE MATTERS.—The provision of section 1 of article IV of the constitution whereby the people reserved to themselves the power and the right "to propose *laws* and amendments to the constitution, and to adopt or reject the same at the polls independent of the legislature," has exclusive reference to those matters of legislative cognizance which in their nature are strictly legislative, as distinguished from ministerial or administrative.

ID.—POWERS DELEGATED TO ELECTORS OF MUNICIPALITIES—LEGISLATIVE MATTERS.—The provision of the same section of the constitution whereby the people delegated to the electors of each city and county, city and town of the state, the initiative and referendum powers, to be exercised under such procedure as might be provided by law, or, until the legislature otherwise provided, in such manner as the legislative body of any such city and county, city or town might provide, is also applicable to legislative matters.

ID.—STREET IMPROVEMENT PROCEEDINGS—LEGISLATIVE ACTS.—Street improvement proceedings in incorporated cities and towns, not governed by freeholders' charters, are legislative in their character, as distinguished from ministerial or administrative.

ID.—ACTS IN FORM OF RESOLUTION—LEGISLATIVE CHARACTER.—Street improvement proceedings are none the less acts of a legislative character, because they are expressed or evidenced in the form of a resolution instead of in the form of an ordinance.

28 Cal. App.—36

ID.—STREET IMPROVEMENT PROCEEDINGS—INITIATIVE AND REFERENDUM INAPPLICABLE TO.—Street improvement proceedings, however, notwithstanding the legislative character of the acts, are not subject to the initiative and referendum provision of the constitution, as the powers given by such constitutional provision and the system established by the legislature cannot coexist, if such provision were applicable.

ID.—STATUTORY CONSTRUCTION—INTENTION OF PEOPLE—SCOPE OF INITIATIVE AND REFERENDUM POWERS.—In examining and ascertaining the intention of the people, with respect to the scope and nature of the powers of the initiative and referendum, it is proper and important to consider what the consequences of applying it to a particular act of legislation would be, and if upon such consideration it be found that by so applying it the inevitable effect would be to greatly impair or wholly destroy the efficacy of some other governmental power, the practical application of which is essential and, perhaps, as in the case of the power to compel the improvement of streets, indispensable, to the convenience, comfort, and well-being of the inhabitants of certain legally established districts or subdivisons of the state, or of the whole state, then in such case the courts may and should assume that the people intended no such result to flow from the application of those powers and that they do not so apply.

ID.—LOCAL CHARACTER OF STREET WORK.—The work of improving streets, as authorized by the street law, is confined to particular districts, and only those persons owning property therein are directly affected by the proposed improvement, and must bear the burdens therefor, and therefore it is not reasonable to suppose that the people, when enacting the initiative and referendum as applicable to municipal corporations, intended to vest voters whose property was not to be affected by the proposed improvement with the right to a voice in the matter of the proposed work.

ID.—EFFECT OF APPLICATION OF POWERS TO STREET PROCEEDINGS.—The effect of the application of the initiative and referendum powers of the people to street improvement proceedings would be not only to deprive interested property owners of the hearings contemplated by the street laws, but would be to delay the improvement to the great inconvenience of the public, and render bonds voted for such improvement of precarious or doubtful value.

APPLICATION originally made to the District Court of Appeal for the Third Appellate District for a Writ of Mandate to compel the town clerk of the town of Rio Vista to perform certain duties with respect to a referendum petition.

The facts are stated in the opinion of the court.

A. R. Price, and C. B. Crossfield, for Petitioner.

W. U. Goodman, and C. N. Kirkbride, for Respondent.

Hartley Shaw, Arthur M. Ellis, Walter Dunn, Frank L. Perry, and White, Miller, Needham & Harber, *Amici Curiae.*

HART, J.—On the eleventh day of March, 1915, this court delivered and filed an opinion in this cause in which it announced the conclusion that the writ of mandate prayed for herein ought to be granted and ordered and entered judgment accordingly. Thereafter and within due time a petition was filed for a rehearing of the cause by this court, and upon a consideration of the petition and recognizing and keenly sensible of the importance of the controversy to the municipalities of the state and the seriousness of the consequences which would of necessity follow the application of the power of referendum delegated to the electors of such municipalities to proceedings in street improvement, we readily granted the petition for further consideration of the cause. Upon the further hearing of the case, many attorneys, representing various municipal corporations and certain individuals interested in contracts for street improvement in a number of the incorporated cities of the state, were heard in able arguments attacking the conclusion arrived at in the original decision of the case. Every point involved in the controversy and every reason which could be conceived or suggested against the soundness of the conclusion to which we had been originally persuaded was examined, analyzed, and advanced with singular clearness and force. And, in the outset, we may as well be frank enough to confess, and, indeed, in view of the seriousness of the consequences which upon fuller reflection we find would inevitably result to municipalities in the matter of street improvements from the conclusion reached and announced in the former opinion, we are pleased to declare, that the arguments upon rehearing have convinced us that the decision upon the ultimate question involved here formerly rendered by this court, even if not faulty in its reasoning from the premises announced or wholly erroneous in conclusions as to some of the questions incidentally arising and necessarily legitimate subjects of discussion in the decision of the main proposition, is, at any rate, one which may, under

the peculiar circumstances of this case, the more justly and, at the same time, upon reasons of equal cogency, be superseded by a conclusion whose effect cannot be to disturb the integrity of the long and well-established system for the improvement of streets in the incorporated cities and towns of California not governed by freeholders' charters.

The following statement of the important legal issue presented by this proceeding and of the contentions, generally stated, of the respective counsel is taken from our former opinion:

"This is an original proceeding in mandate to compel the respondent, as town clerk of the town of Rio Vista, to perform certain duties, alleged to be enjoined upon him by law, with respect to a referendum petition filed with his office, the purpose of which is to cause to be submitted to the voters of said town of Rio Vista a certain resolution, passed by the board of trustees of said town, establishing the grades of certain streets and avenues thereof.

"The town of Rio Vista is a municipal corporation of the sixth class, having been organized as such under and by virtue of the laws of this state.

"The petitioner is and at all times mentioned in the petition was a resident, freeholder, taxpayer and qualified elector of said town, and is and was one of the persons who signed the petition for the referendum election above mentioned.

"The resolution referred to was passed and adopted by the board of trustees of said town, at a regular meeting of said board, on the 10th day of September, 1914, and was and is designated as 'Resolution No. 20,' and is entitled, 'A Resolution Establishing Grades on Certain Streets and Avenues of the Town of Rio Vista and Relating to Curb Lines,' said resolution having been duly attested by respondent as town clerk of the town of Rio Vista.

"The petition alleges that, within thirty days after the final passage of said resolution, and within the time allowed by law, 'a petition protesting against the passage of said resolution and petitioning for a referendum election thereon, signed by qualified voters of the said town of Rio Vista equal in number to more than ten per cent (to wit: forty-four per cent) of the entire vote cast for all candidates for governor of the state at the last preceding general municipal election held in said town of Rio Vista, and duly verified as

prescribed by an act of the legislature entitled "An act to Provide for direct Legislation by Cities and Towns, including Initiative and Referendum," approved January 2, 1912 (Stats. (Ex. Sess.) 1911, p. 131), was filed with and presented to the said respondent, as clerk, etc., with the demand upon him that he proceed within the time required by said law to examine the signatures to said petition and certify as to the sufficiency of said signatures. It is alleged that said petition for a referendum election contained all the matters and facts required thus to be shown by said act of the legislature, and conformed in all respects to the provisions thereof; that the respondent, as town clerk, etc., has not performed his duties respecting said petition or certified to said petition within the time required by law, but that he "has willfully neglected and refused, and still willfully neglects and refuses, to examine said petition and affix thereto his certificate showing the result of said examination," etc. It is further alleged "that, on the 15th day of October, 1914, the board of trustees of the town of Rio Vista passed a resolution in reference to said petition for a referendum election, in words and figures as follows, to wit: " ' "Petition for Referendum," ' " signed by W. E. M. Chase and about 92 others, read and on motion duly made and seconded, same was ordered on the table by an unanimous vote of the said board.'

"The respondent has interposed a demurrer to the petition on both general and special grounds. Numerous special objections are thus made against the petition, but, according to our understanding of the parties to this proceeding, their chief desire is to obtain a decision of the questions involving the merits of the controversy, and which are raised by the general demurrer. We will, therefore, refrain from considering *in extenso* the points arising upon the special objections to the petition which are embraced within the special grounds of the demurrer.

"The respondent claims, and upon that ground based his refusal to perform the official acts as to which it is alleged he is, *ex industria,* in default, that a resolution of a municipal governing board establishing the grades of the streets of such municipality is not subject to the operation of the statute (above referred to) authorizing direct legislation by cities and towns, by way of the initiative and referendum, and that, therefore, there was no legal duty resting upon him, as clerk,

etc., to examine the referendum petition involved here to ascertain whether or not it was signed by the requisite number of qualified electors and to certify the result of such examination, as required by the said statute.

"The petitioner holds to a contrary view, claiming that, although the law relating to the improvements of streets, alleys, etc., in municipalities contemplates that the governing boards thereof may, by 'resolution,' establish street grades, etc., such act is in its nature legislative rather than ministerial or administrative and is, therefore, subject to the initiative and referendum provisions of the statute authorizing direct legislation in cities and towns."

In said opinion, we expressed the following views relative to the nature and scope of the initiative and referendum powers as reserved by the people to themselves and by them conferred upon the electors of the counties, cities, and towns in the state:

"By the adoption of section 1 of article IV of the constitution, the people reserved to themselves the power to propose laws and amendments to the constitution, and to adopt or reject the same, independently of the legislature, and also reserved to themselves the power, 'at their own option to so adopt or reject any act, or section or part of any act, passed by the legislature.' At the same time and by the same section, they reserved or, more accurately speaking, delegated to the electors of each city and county, city and town of the state, the initiative and referendum powers of the people, to be exercised under such procedure as might be provided by law, or, until the legislature otherwise provided, in such manner as the legislative body of any such city and county, city or town might provide. (Stats. 1911, pp. 1655, 1659.)

"Undoubtedly, the provision of the constitution whereby the people reserved to themselves the power and the right 'to propose *laws* and amendments to the constitution, and to adopt or reject the same at the polls independent of the legislature,' has exclusive reference to those matters of legislative cognizance which in their nature are strictly legislative, as distinguished from ministerial or administrative. In other words, the power thus reserved is that which is exercisable only in the formation of *laws* in the strict and ordinary legal sense of that term—that is, laws promulgating certain rules of action for the guidance of the people in their multifarious

relations with each other and to the state, and consequently can have no reference to acts, of which a variety may be conceived, so far as local legislative bodies are concerned, which are not, in their nature, intrinsically legislative, but which may incidentally and necessarily arise and fall within the legitimate cognizance of a legislative body in the exercise of its chief or paramount function of government. That this is the correct view of the provision of the constitution referred to, is borne out and sustained by the consideration that, obviously, section 1 of article IV deals entirely and exclusively with the *legislative* power of the state, which has always been held to mean the power to make or form *laws*. (See *Brown* v. *City of Galveston*, 96 Tex. 1, [75 S. W. 488] ; *Walker* v. *City of Spokane*, 62 Wash. 312, [Ann. Cas. 1912C, 994, 113 Pac. 775, 780].) Besides, it is unreasonable to suppose that the people could have intended to include the right to subject to the operation of the power as so reserved by them any act, if, indeed, strictly speaking, there be any such acts exercisable by the legislature of the state, which is of a ministerial rather than of a legislative character; for a ministerial act is one with respect to the performance of which a public officer can exercise no discretion. It is an act or duty prescribed by some existing law which it is absolutely incumbent upon the officer to perform precisely as it is laid down by the law, and, even if such an act were intended to come within the contemplation of the direct legislation provision of the constitution, it would be impracticable to subject it to the operation of such provision, or, at any rate, such a practice could not be enforced without interrupting or seriously hampering the orderly administration of the public business.

"Our conclusion upon this branch of the case before us is that while the people, who constitute the paramount source of all the legislative power of the state, have delegated to a designated body of persons the power to make laws establishing or prescribing rules of action, they, at the same time, have reserved to themselves such control over the power thus delegated as that they may themselves directly exercise it and thus even override or overrule the judgment of the legislative body in the matter of making laws whenever, in their own judgment, the exigencies of a particular occasion may require or justify such a course.

"And the same conclusion must follow a consideration of the last paragraph of section 1 of article IV of the constitution, whereby there are reserved or delegated to the electors of the cities and counties, cities and towns of the state, the 'initiative and referendum powers' of the people. That the powers so delegated or reserved, as the provision itself expresses it, to such electors were intended to be identical in nature with the powers reserved by the people to themselves —that is, to propose local laws and to adopt or reject the same, independent of the local legislative body, must become plainly evident upon reading and considering the entire section as a whole. The initial language of the last paragraph of said section reads: '*The* initiative and referendum powers of the people are hereby *further* reserved to the electors of each county, city and county, city and town of the state,' etc. This language clearly presupposes the existence of such powers in the people, and unquestionably refers to the power to propose laws and amendments to the constitution reserved to the people by the preceding provision of said section — that is, it refers to the legislative power which is the character of the power reserved by the people. In so construing said section, in so far as it applies to the electors of municipalities, we are aided and, indeed, sustained by the act of the legislature (above referred to) prescribing the procedure to be followed by such electors in exercising and invoking the powers so reserved to them. The title of said act is: 'An act to provide for *direct legislation* by cities and towns, including the initiative and referendum.' Thus we have an interpretation by the legislature of the provision of the constitution under consideration and of the nature and extent of the powers thereby delegated to the electors of the cities and towns of the state—an interpretation clearly disclosing that in the legislative judgment the powers so reserved are purely and solely of a legislative character in the true sense of that term as it is ordinarily understood."

After expressing the foregoing views, we declared that the question whether the several acts involved in proceedings in street improvement were subject to the power of the referendum would rest upon the solution of the proposition of whether such acts were or were not legislative in their character, and, upon an examination of that proposition by the light of the authorities, we concluded and declared that such

acts were legislative, as distinguished from ministerial or administrative acts, and were consequently subject to the operation of said powers. We further held that, since all said acts were authorized by the general street law to be evidenced in the form of a resolution, it was not necessary, nor, indeed, required, by the terms of said act, to put them in the form of an ordinance as that term is technically as well as ordinarily understood, and that they were none the less acts of a legislative character because expressed or evidenced in the form of a resolution.

We still adhere to the views thus expressed, although it is to be conceded that the hearings accorded by the street law to the property owners and the determination therein by the city council of the matters presented for adjudication involve a proceeding which partakes more of the judicial than the legislative character; still this is not to say that the initiatory steps in street improvement proceedings are not of a legislative character. However, as before stated, we have been led to the conclusion upon a reconsideration of the case, that, notwithstanding that resolutions of intention to establish grades or otherwise improve streets are of a legislative character, none of the steps necessary to be taken in proceedings for street improvement was intended by the people to come within either the power of the initiative or that of the referendum as delegated by the people through their constitution to the electors of municipal corporations. This conclusion follows from the conviction, to which a re-examination of the vital question involved herein has unavoidably led us, that the powers referred to and the system established by the legislature for the improvement of public streets cannot coexist, if it be true that the former are applicable to the latter. This proposition, it is true, is to be considered only in aid of the ascertainment of the intention of the people as to the scope of those powers or of determining whether they intended certain limitations in the exercise thereof or that certain acts of a legislative character should not be made amenable thereto. For, in examining and ascertaining the intention of the people with respect to the scope and nature of those powers, it is proper and important to consider what the consequences of applying it to a particular act of legislation would be, and if upon such consideration it be found that by so applying it the inevitable effect would be greatly to impair

or wholly destroy the efficacy of some other governmental power, the practical application of which is essential and, perhaps, as in the case of the power to compel the improvement of streets, indispensable, to the convenience, comfort, and well-being of the inhabitants of certain legally established districts or subdivisions of the state or of the whole state, then in such case the courts may and should assume that the people intended no such result to flow from the application of those powers and that they do not so apply.

There is language in the concluding portion of our former opinion to which the proposition involved in the foregoing views may appear to run counter, but the language referred to must be understood as applying only to those instances where the law considered is in plain and unambiguous language—language as to whose meaning there can be no possible doubt, in which case the plain intention of the legislature or of the people, as the case may be, must receive the sanction of the courts, although the consequences of the enforcement of such law will work great inconvenience or hardship to those upon whom it was designed to operate.

It is not necessary to dilate upon the supreme importance to the public of the power vested in or delegated to municipal corporations to coerce the improvement of streets within their respective limits; for it is only trite to say that there is no function of the variety ordinarily committed to municipal governments more conducive to the convenience, comfort, and common welfare of urban communities than that with which they are invested by the legislature in the matter of public street improvement. So, recognizing the vital importance of and, indeed, the absolute necessity for good and well maintained streets in all the cities and towns of the state, the legislature, in the exercise of its police power, it may be, or, at any rate, bringing into play one of the attributes of the sovereign power of the people of a state, has, after many years of practical experimentation, finally evolved a system or scheme for street improvement which gives to municipal corporations plenary power to compel such work to be done and at the same time hedges about property owners, upon whom the burden of the expense of such improvement rests, certain safeguards whereby they are amply protected against burdens not legitimately flowing from the proceedings looking thereto by according to them the right to be heard in protest against

the establishment or changing of grades or the proposed improvement and, finally, against the assessment levied to pay for the improvement.

Now, these propositions may first be stated as incontrovertible: That, if the resolution of intention to improve streets is a legislative act, then the resolution of intention to establish or change the grades of streets is likewise a legislative act; 2. That, if it should be necessary to hold that such acts are subject to the operation of the referendum, with equal reason must they be held to be within the operation of the power of the initiative.

There are several different and distinct steps requisite in street improvement proceedings which must be initiated or expressed in the form of a resolution. Among these are the resolution of intention to establish or change the grades of streets and the resolution of intention to improve the same. Under the street law, perhaps, the proposition to establish grades or to regrade streets and otherwise to improve them may be incorporated in one resolution of intention. (Stats. 1911, sec. 3, p. 733; see, also, Stats. 1885, p. 147.) But a proposition to regrade or change the grades of streets may be the sole and single subject-matter of a resolution of intention. (Stats. 1909, p. 1018.) The law in both cases, however, gives to property owners the right to protest against the proposition to regrade or establish grades and against the other proposed improvement of the streets, and if such right be exercised and the protest sustained, then the city council or other governing body of the municipality loses jurisdiction further to proceed in the matter for a period of six months. The protests of the property owners must be in writing and, under the "Change of Grade Act" of 1909, *supra,* must be filed with the clerk of the council within thirty days after the first publication of the notice of the passage of the resolution of intention, and, under the Street Improvement Act of 1911, must be filed with such clerk within fifteen days after the date of the second publication of such resolution, etc. There is also a provision authorizing the owners of property, within ten days after the award of a contract to improve the streets, to file a written notice with the city council of errors or defects or faults in the previous proceedings, if any there be. It is further provided that, after the assessment is made by the superintendent of streets, the property owners,

within thirty days after the date of the warrant attached to the assessment, if they feel aggrieved by any act or determination of such officer in relation to the assessment, or who claim that the work has not been performed according to the contract in a good and substantial manner, or have or make any objection to the correctness or legality of the assessment or other act, or determination, or proceedings of the superintendent of streets, may appeal to the city council by stating their objections in writing and filing the same with the city clerk, and it thereupon becomes the duty of the council to hear such objections and determine whether the same be or be not valid, and render an ultimate decision accordingly.

Thus it will be observed that the legislature has taken the pains to provide the means and the remedy whereby property owners *who and whose property would be directly affected by the proposed improvement* might secure protection against unjust or illegal acts on the part of the officers charged with the duty of inaugurating and superintending the proposed improvement or the establishment or changing of street grades. In other words, the street law has constituted the council a tribunal to which property owners affected by the proposed improvement and no other persons may appeal for the adjudication of their rights in the proceedings, and, as before suggested, the procedure or proceeding prescribed for these hearings may well be said to be judicial rather than legislative in character. It is important, however, to emphasize two propositions in connection with these provisions of the street law. The first is that the property owners affected by the proposed work are entitled to be heard in the matter of the proposed improvement, and the second is that property owners whose property is not so affected have no voice therein.

These provisions of the law grow out of the proposition that proceedings in street improvement are *in invitum,* and, in view of that character of such proceedings, the legislature most logically and, indeed, we may add, necessarily, provided that, before their property should be assessed and subjected to sale for the nonpayment of the assessment, property owners should have a hearing and have it legally determined: 1. Whether the proceedings should or should not be pressed and the assessment levied at a particular time; 2. Whether

the proceedings already had were free from error or defects or the assessment as levied was just or legal.

It must become obvious upon a moment's reflection that the hearings thus contemplated and, in fact, expressly provided for, could not be accorded property owners if proceedings in street improvement or any of the essential acts involved therein were subject to the test or conditions of either the initiative or the referendum.

The act providing for direct legislation by the electors of cities and towns, "including the initiative and referendum," passed at the extra session of the legislature in 1911 (Stats. (Ex. Sess.) 1911, p. 131) for the purpose of carrying out the provisions of the constitution delegating the power of direct legislation to the electors of municipal corporations not governed by freeholders' charters, provides that an ordinance adopted by the initiative plan shall thereupon become a binding and valid ordinance of the city or town, "and be considered as adopted upon the date that the vote is canvassed and declared by the canvassing board, and *go into effect ten days thereafter.*"

It is further provided by said law (referring to the power of the referendum) that, except ordinances involving certain specially enumerated classes of municipal legislation, no ordinance passed by the legislative body of a city or town shall go into effect before thirty days after its passage, so that, in the mean time, the qualified voters may protest against the passage of such ordinance, and failure by the legislative body to heed such protest and so repeal the same will necessitate a reference of such ordinance to the voters of the city or town at an election to be called for that purpose, the effect of its rejection by the people at such election being to render it nugatory and of no effect.

It is plainly apparent that no part of the proceedings in street improvement could be subjected either to the initiative or referendum without completely destroying the right of property owners whose property is to be affected by such proceedings to be heard upon the question whether the proceedings, when first inaugurated, should be suspended for the period of six months, as provided by the street law, or upon the question whether the assessment is erroneous or valid or not valid. By the initiative process, a resolution of intention to improve streets, if adopted by the voters, would go

into effect ten days after its adoption and, under the essential theory of that power, would become conclusive upon the property owners whose property is affected thereby. The property owners would thus be denied a voice in a proceeding which might result in depriving them of their property, and this might in certain cases amount to the taking of their property without ''due process of law.'' A similar result would, obviously, follow the application of the power of the referendum to such proceedings.

Moreover, the effect of applying those powers to such proceedings would be to delay, to the great inconvenience of the public, street improvement. Indeed, under such circumstances, it would be difficult if not impossible to make progress in street improvement in the cities and towns of the state, and from that situation the public would not alone suffer but such cities and towns themselves would be seriously handicapped in the march of progress which is now of the spirit of the times. Again, a still more serious situation would be in the probable effect that the application of those powers to street improvement proceedings would have upon bonds voted and issued for street improvement purposes. They would thus become of precarious or doubtful value and thus an insuperable obstacle to their sale arise. The inevitable result would be that progress in street improvement would be greatly hampered. Besides, it would be difficult to find a contractor who would be willing to accept a contract for building streets under a system which is made amenable to the contingencies incident to the powers referred to.

Thus it is plainly evident that the inevitable result of the application of the powers in question to proceedings arising under the general street law would be, practically, to completely overturn or render absolutely purposeless the scheme thereby established for the improvement of streets. It would be going a long distance toward impeaching the intelligence of the people to hold that, when delegating the powers in question to the electors of municipal corporations, they did not have in mind the damaging consequences which, obviously and inevitably, would follow the application of those powers to any one of the acts essential to the consummation of street improvement proceedings. Indeed, in view of the absurd situation which would be brought about by upholding the claim of the petitioner here, we may assume, if, indeed, not

presume, that the people, presumptively familiar with the street improvement system as it has been established by the legislature, intended that the initiative and the referendum should not be invoked as to any of the series of acts involved in the proceedings and the procedure according to which only the streets of cities and towns of the state not controlled by freeholders' charters may be improved.

There is, however, another and, perhaps, a more forceful consideration upon which the conclusion may rest that the initiative and the referendum powers of the electors of municipalities were not intended to operate upon any of the necessary steps in street improvement proceedings, and it is this: That the work of improving streets, as authorized by the street law, is confined to the particular street or a portion thereof to be improved, or, it may be, to a particular district within the municipality. The work, in other words, is in a sense local to a particular part of the city or town, and, while, of course, the community as a whole is interested in the installation and maintenance of good streets throughout the entire city or town, yet only those persons owning property adjoining or abutting upon the streets proposed to be improved are directly affected by the proposed improvement. It is, in other words, only a comparatively small number of those owning property within the corporate limits of the city or town who must bear the burdens of the proposed improvement; and it is not reasonable to suppose that the people, when enacting the initiative and referendum as applicable to municipal corporations, intended to vest voters whose property was not to be affected by the proposed improvement or to stand as indemnity for any portion of the burdens thereof, and much less voters having no property at all within the corporate limits, with the right to a voice in the matter of the proposed work; for such right in such persons would be directly contrary to the letter as well as the spirit or reason of our street law and to the essential theory upon which the power in the government to coerce the improvement of streets at the expense of the owners of property proceeds. The provisions of the street law themselves, as we have shown, distinctly and with eminent propriety negative the idea of interference in street improvement proceedings by any other persons than those whose property is to stand good for the expense of the improvement. These obvious

considerations with respect to the comprehensive plan involved in the street improvement and change of grades acts of this state, it must be assumed, were in the minds of the people when they granted to the electors of cities and towns the power of direct legislation.

But we are not altogether alone upon the proposition last advanced.

Judge Dillon, in his work on Municipal Corporations, volume 1, section 24, says, "If we analyze the complex powers usually conferred upon a municipality in this country at the present time, we shall discover that these are of two general classes, namely: 1. Those which relate to health, good government, efficient police, etc., in which all the inhabitants have an equal interest and ought to have an equal voice. 2. Those which directly involve the expenditure of money, and especially those relating to local improvements, the expense of which ultimately falls upon the property owners. As respects these, the controlling voice ought to be with those who have to bear the burden."

The constitution of Arizona contains the following provision, which, it will be noted, promulgates or establishes a rule which is in perfect harmony with the whole theory of our own street improvement acts: "Questions upon bond issues or special assessments shall be submitted to the vote of property taxpayers, who shall also in all respects be qualified electors of the state, and of the political subdivision thereof affected by such questions."

The supreme court of that state, in the case of *City of Globe* v. *Willits,* 16 Ariz. 378, [146 Pac. 544], was called upon to consider and decide the question whether the act of the common council of the city of Globe, in ordering the construction of a main-trunk sanitary sewer system, was subject to the operation of the power of the referendum as reserved by the people in their constitution to the electors of incorporated cities and towns. The ordinance provided that the city should constitute a district for the assessment of the costs of the work and for the issuance of interest-bearing bonds for assessments amounting to more than twenty-five dollars. By the terms of the general law pursuant to whose provisions the ordinance was passed, the real property to be benefited by the improvement was made liable for the expense of making the same, and, as by our street

law, it is by said act provided that the amount assessed against each lot of land shall be a lien thereon, and the sale of such land for delinquency is thereby authorized. The act creates a special fund, made up of the assessments collected, and from such fund alone the improvements ordered shall be paid for.

The court held that, since the burden of paying for the improvement was wholly upon the property owner and no liability by reason of the improvement created against the municipality, the ordinance was subject to neither the initiative nor the referendum power granted to the electors of municipal corporations. Among other things, the court, after quoting the provision of the constitution reserving to the electors of cities and towns the power to initiate and refer municipal legislation to a vote of the qualified electors, said: "In construing this provision of the constitution as it affects the question before us, it should be borne in mind that there are some subjects of legislation by a city in which all the residents are alike interested, and others that directly affect particular persons or property, and in which the citizenry generally is not concerned," citing the above quoted section from Judge Dillon's work. "The undertaking by the council in this case," proceeds the court, "was to impose on the real property situate in the city of Globe a special assessment to be apportioned according to benefits received. Only those persons owning realty in the city are affected, and they only, unless the constitution provides a different rule, should be consulted. Those who pay no taxes and contribute nothing for the improvement certainly have no pecuniary interest in the matter."

While that case was decided upon the provision of the Arizona constitution above quoted, restricting the right to vote upon questions involving proposed bond issues or special assessments to "property taxpayers," still the general language of the opinion is of pertinent force in this case, because, as we have shown and as is plainly manifest, the basal theory of the provision of Arizona's organic law, above quoted, is in all the essential aspects of the proposition identical with that of our own street improvement acts, viz.: That the property to be benefited by the work of improvement, being liable for the payment of the expense of the same, the owners of such property should, to the exclusion

28 Cal. App.—37

of all other persons, have a voice in the matter of the proceedings whereby the improvement may, under the law, alone be initiated and consummated.

In the very recent case of *Hopping* v. *Council of the City of Richmond,* 170 Cal. 605, [150 Pac. 977], our supreme court, while expressly declining to décide the question, because it was not before it in that case, strongly intimates that where legislative acts are of a special and local nature, and by which the entire body of persons competent to exercise the power of the initiative and the referendum is not affected, they do not come within the operation of those powers. This is the precise language of the court in that case: "There may be grounds for excluding from the operation of these powers legislative acts which are special and local in their nature and in which the entire body of citizens who shall exercise the power of referendum and initiative is not interested, such as resolutions to make local improvements and the like. This question is not before us, for the matters determined by the resolution are not local to any particular part of Richmond but apply generally to, and interest all in the entire city. The doctrine alluded to was stated by the supreme court of Arizona in *Globe* v. *Willis,* 16 Ariz. 378, [146. Pac. 544], but the case was decided upon a consideration of the particular language of the Arizona constitution. Inasmuch as the question will doubtless be brought before us in the future, we desire to state here that we express no opinion on the subject and that what we have said must not be understood as having any bearing thereon."

We have thus given the main proposition submitted here somewhat elaborate consideration because of the overruling importance to the cities and towns of the state to which the initiative and referendum powers of the people apply of the issue so presented, and, as before stated, have, upon a more mature reflection than was given the question in our original consideration thereof, been persuaded to the conclusion to which the views herein expressed logically lead.

In accordance with those views, the application for a peremptory writ of mandate is denied and the order to show cause discharged.

Chipman, P. J., and Ellison, J., *pro tem.,* concurred.