[Civ. No. 8591. First Appellate District, Division One.—March 14, 1933.]

HELEN ST. JOHN et al., Appellants, v. G. B. KING et al., Respondents.

Alfred J. Harwood, R. L. Chamberlain and W. R. Augustine for Appellants.

Jordan L. Martinelli, City Attorney, and Kirkbride, Wilson & Brooks for Respondents.

ATTERIDGE, J., *pro tem.*—Appellants, who were plaintiffs in the court below, attack the validity of certain street improvement proceedings of the council of the city of San Rafael, which had been taken under and pursuant to the Improvement Act of 1911 (Stats. 1911, p. 730) and the Improvement Bond Act of 1915 (Stats. 1915, p. 1441). By their action they sought to quiet their title to certain real property in the city of San Rafael against liens arising by virtue of the aforesaid proceedings in favor of certain named

defendants on account of unpaid assessments for said improvement work, and also to prevent by injunction the issuance of bonds against the said assessment liens and property.

Aside from the contentions of plaintiffs hereinafter specifically considered and determined, plaintiffs make no other attack upon the regularity of the proceedings or the jurisdiction of the San Rafael city council to order and require the performance of street improvement work in question, which was fully performed in accordance with the contract therefor. It is unnecessary, therefore, to set forth any extended review of the proceedings as a whole.

As their main contention of invalidity against the proceedings referred to, plaintiffs urge that two alleged streets (within the assessment district) upon which the work of improvement was performed, were not public streets and that the proceedings are for that ascribed reason void and invalid. ■ It is, of course, essential under the Improvement Act of 1911 that the works of improvement therein provided for be constructed only upon streets or other similar public rights of way which are either owned by a municipality and "open or dedicated" to public use at the inception of the proceedings, "or which may [t]hereafter be opened or dedicated to public use". (Sec. 1 of the Improvement Act of 1911.) In the latter alternative the requirements of the statute are sufficiently met if the land, asserted to be privately owned, is lawfully dedicated or acquired prior to the entry of a judgment in any given action attacking the validity of the proceeding on that ground. (Sec. 26 of the Act of 1911, Stats. 1923, p. 117; *Rice* v. *Hanrahan Co.*, 210 Cal. 625, 629 [293 Pac. 57].) ■ Here, however, the trial court directly found against the contentions of plaintiffs to the contrary, that Fifth Avenue and Scenic Avenue, the streets in question, in so far as they were "improved" in these proceedings, "were and now are *open public streets,* avenues and ways of land in said City of San Rafael, and *open to public use* with duly established official grades and widths, which grades and widths and the curb lines and pavement and sidewalk areas of said streets had, prior to the passage of the resolution of intention [in said proceedings] hereinafter mentioned, been duly fixed, established and defined by the city council". (Italics ours.)

(Finding No. V in relation to section or paragraph V of the answer.)

Our review of the record discloses that the foregoing finding is amply supported by the evidence. As early as 1882 a map had been recorded by the then owners of the tract of land embracing these streets at the *locus* of the improvements in question, which delineated these streets with such sufficient certainty as to thereby indicate an intention that the same should be devoted to street or highway purposes. While it is true that the said map in outlining said streets refers to them merely by the legend ''graded road'', that circumstance should militate but slightly against the effectiveness of the map as an implied offer to dedicate the portion of land so delineated to public use—especially when (as is the case here) other weighty evidence of such an intent on the part of succeeding owners of the land was manifested and developed during the long period of years that ensued after the filing of the map and while the effect of the same as an implied offer to dedicate remained unaffected by any attempted act of revocation. For, in addition to the evidence of an offer to dedicate that may be implied from the filing and continued recorded existence of the map, there was in evidence that the portions of the land taken by the city of San Rafael for public street purposes had been *fenced on both sides thereof* for a long period of years, and remained throughout all of said period, and up to and including the inception of these proceedings, *open* to and actually in extensive public use. The evidentiary significance of these additional circumstances is made apparent in the case of *Sherwood* v. *Ahart,* 35 Cal. App. 84 [169 Pac. 240].

In claimed avoidance of their said effect, appellants, however, stress upon the fact that after the fences had been in continued existence for a great many years, a storm destroyed a portion thereof in 1921, and that thereafter the same was not replaced; and also upon the further fact that one of the appellants, in her testimony, locates the original line of a part of said fencing directly upon a portion of the land utilized for street purposes. In response to the former claim, it will suffice to state that with respect to such prescriptive rights in favor of the public as may have ripened into a perfection thereof, throughout the long and extensive

public use of the land lying *between* the remaining fenced-off portions of land under private ownership prior to the date of the said destruction of a part of the fences by the elements, such rights would not be impaired through mere negative inaction with respect to the replacement thereof after that date. As to the actual location of the fence at earlier dates, the evidence is conflicting, and under familiar rules of appellate practice we are, of course, bound to uphold the determination thereof as made by the trial court, which was against plaintiffs.

Lending some additional support to the foregoing quoted finding is the further fact that appellants, of their own volition and at their own expense, had placed curbs and gutters along a portion of the line of the proposed improvement. The remaining portion of the curb (provided for in the resolution of intention and by the plans and specifications under review) was but a prolongation of the work previously placed by appellants themselves. These first referred to curbs and gutters were constructed according to grades given appellants at their request by the city engineer on the location. The trial court could properly consider the circumstances last herein referred to, along with the other evidence, as indicative of some recognition on the part of appellants of the public character of the streets about to be improved, inasmuch as owners of real property do not ordinarily place concrete curbs and gutters in dislocated sections along private roads.

■ Upon the question of an acceptance of the dedication of the streets in question there is abundant evidence. First (as previously pointed out) there was evidence of long and continuous usage by the public of these streets, which tended to establish that they had been open, traveled streets for at least twenty-two years. Secondly, on May 4, 1925, the city council passed an ordinance specifically identifying these streets by their then existing names and therein officially changing them to their present names. Subsequently, on June 15th, it passed an ordinance establishing their official grades, and on August 3d it adopted the plans and specifications for their improvement, wherein they were shown as and referred to as streets. The recitals in these ordinances and resolutions show and refer to these avenues as *streets*. This in effect was an acceptance of, and a declaration by

the city of their public character, for "the recitals in a public statute are conclusive evidence of the facts recited for the purpose of carrying it into effect . . . " (Sec. 1903, Code Civ. Proc.)

In thus affirming the sufficiency of the evidence to support the finding under attack it has not been necessary to attach controlling importance to any particular one of the foregoing recited evidentiary factors, because from the date of the filing of the map (earlier herein referred to) each successive circumstance in turn supplements the others in giving strength to the finding so that their cumulative force and effect is to satisfactorily establish a dedication of land to public use to that high degree of unequivocableness made requisite by the long line of California decisions upon the subject. Illuminative, however, of their entire sufficiency in this respect is the following recent pertinent declaration by the United States Circuit Court of Appeals, Ninth Circuit, while construing an Arizona street improvement statute which, in so far as the matters now under consideration are concerned, is in all respects identical with the California statute (sec. 1 of the Improvement Act of 1911) involved on the present appeal:

"The opening of a street is usually held to be an offer to dedicate it to the public. In order to complete the dedication and constitute the open street a public street, there must be an acceptance of the proposed dedication. This may usually be implied from mere user thereof by the public. If a street were open with the knowledge and consent of the owner and after such opening the authorities of the city enacted ordinances for its improvement, their enactment would, we think, constitute an acceptance of the dedication and *ipso facto* constitute the street a public street. See *San Francisco S. Co.* v. *Contra Costa County,* 207 Cal. 1, 6 [276 Pac. 570]. . . . The Arizona statute . . . is taken bodily from the Vrooman Act of California (St. Cal. 1885, p. 147, sec. 1)."

Our quotation is from *Collins* v. *City of Phoenix,* 54 Fed. (2d) 770, 776.

■ It should be further mentioned that appellants in claiming that the evidence is insufficient to show a dedication of the land shown on the map of 1882 to public use place considerable stress upon the circumstance that the streets

in question as now laid out do not in all respects follow the contour lines as shown on said map. This, however, is a comparatively unimportant circumstance, as all the land utilized by the city for public street purposes, which was actually involved in the proceedings in question and for whose improvement alone appellants are assessed, is shown definitely by the evidence (relied upon by the trial court) to be within the boundaries of land found by it to be dedicated to public use. Appellants would not, therefore, be injured, nor can they complain, if other land (not involved in these proceedings) outside the boundaries of the "old graded road" was at an earlier date improved and utilized for public street purposes through the consent and acquiescence of the owners of property on the opposite side of the street, who were alone affected thereby.

As their second major ground of objection to the validity of the proceedings, appellants urge that the assessment is void upon the alleged ground that the official grades of the streets about to be improved had not been finally established at the date of the passage of the resolution of intention. One of their arguments of invalidity in this respect is based upon an alleged insufficient sequence of the time intervening between the passage on July 6, 1925, of two certain ordinances establishing the official grades of the two streets involved, and the passage of the resolution of intention on August 3, 1925. It appears that although said first referred to ordinances were passed on July 6th, the date of their going *into effect* was suspended by virtue of their own provisions in that respect as well as the requirements of the charter of the city of San Rafael, for the period of thirty days, which would make their first effective date August 5th, and which date, it will be observed, is two days later than the passage of the resolution of intention. However, on August 3d, after first adopting plans and specifications for the work, upon which the line and grade of the work were shown in detail, the city council adopted its "resolution of *intention*" to have the work "done to the existing established grades . . . heretofore adopted by said City Council *and shown on and described in said plans and specifications*". (Italics ours.) Conceding that the date of the passage of the "resolution of *intention*" was two days in advance of the effective dates of the earlier *ordi-*

*nances* establishing by distinct legislative fiat the official grades of the street, we are unable to perceive how that circumstance could in any degree substantially affect any of the rights of owners of property within the assessment district, or deprive them of any of the "due process of law" requirements assured them by virtue of the statute in question. ▮ A "resolution of intention" in a street improvement proceeding is the primary or fundamental declaration by the governing body of the city that it will presently cause to be performed through the taking of a successive series of further jurisdictional steps or acts, a given work of improvement which must therein be adequately described.

With respect to grades, section 3 of the Improvement Act of 1911 provides: "The grade to which any work shall be done or improvement made *shall be such as may be shown on the plans or profiles therefor* or it may be done on such a grade as may have been formally established by the City Council." (Italics ours.)

▮ Accordingly, therefore, the act of the city council in adopting plans upon which the grade of the work of improvement was shown in detail, and in thereafter incorporating the same by reference into its "resolution of intention" was under the statute itself a sufficient compliance with the statute with respect to the matter of establishing grades. However, it so happens here that the grades established on the plans coincide with those stated in the ordinances officially establishing grades, which in any event became effective two days after the passage of the resolution of intention, which, it is to be remembered, is one of "intention". Furthermore, if afforded sufficient opportunity to protest, appellants would not be injured through failure to establish grades at any time preceding the passage of a resolution ordering the work (as provided for in section 3 of the act), which may only be done after a period of at least fifteen days has been afforded all property owners within the district to protest or "show cause why said proposed improvement should not be carried out", and to then and there ascertain on inquiry, if in doubt on the subject, just what grades, if any, had been established. In the present case a protest period of twenty-four days was afforded. During all this period appellants had full and complete

notice of the grade to which the work was to be done as the same was to them and all others shown by the plans and specifications on file.

It should be further observed that appellants' argument upon the invalidity of the proceedings with respect to their alleged failure to establish grades is based upon *City of Napa* v. *Easterby*, 61 Cal. 509, and certain other kindred cases, all of which involved street improvement statutes antedating the Improvement Act of 1911, and no one of which said statutes contained an alternative method of establishing grades such as is provided by section 3 of the Improvement Act of 1911. Since the enactment of this provision into the last-mentioned statute, our courts have had but slight, if any, occasion to invalidate proceedings by reason of a deficient establishment of grades. The only practical purpose subserved through the establishment of grades is to fix the vertical position of the proposed work so as to thereby indicate and regulate the amount of excavation and fill involved. Obviously this purpose can be as well achieved by placing the grade elevations on the plans as it could by reciting them in an ordinance, and since section 3 of the Improvement Act directly provides (alternatively) for this method of establishing grades, we hold that the proceedings are not defective in the particulars advanced to us by appellants in this respect.

In view of our determination in this respect (based upon the conformity of the proceedings with section 3 of the Improvement Act of 1911) it has become unnecessary for us to discuss at length a further claim advanced by appellants that the separate ordinances (earlier referred to) establishing grades were subject to referendum action on the part of the electors of the city of San Rafael and that by reason thereof no grades had been legally established at the date of the passage of the resolution of intention. Having in view, however, the fact that these proceedings involved only portions of two streets within an assessment district of definitely limited area, and that the entire costs of the improvement were borne by and spread against such property only as was embraced within the district, we are unable to perceive how such proceedings could in any appreciable degree become matters of legislative or financial concern to the electors of the city *as a whole*. It has been

repeatedly held that the referendum does not apply to acts of the character in question. (*Chase* v. *Kalber*, 28 Cal. App. 561 [153 Pac. 397]; *Dwyer* v. *City Council*, 200 Cal. 505, 518 [253 Pac. 932]; *Newsom* v. *Board of Supervisors*, 205 Cal. 262, 271 [270 Pac. 676]; *Hyde* v. *Wilde*, 51 Cal. App. 82 [196 Pac. 118]; *Starbuck* v. *City of Fullerton*, 34 Cal. App. 683 [168 Pac. 583].) ▮ Moreover, it has also been held that the curative clause in the Improvement Bond Act of 1915 (which was adopted as an integral part of these proceedings) will apply so as to remedy slight deficiencies in similar proceedings relating to the time when ordinances establishing grades became effective. (*Hall* v. *Fairchild-Gilmore-Wilton Co.*, 66 Cal. App. 615 [227 Pac. 649].)

▮ Appellants also object that the width of the streets improved was not established. The record does not sustain this claim. The width of the roadway is clearly shown on the plans (which were a part of the resolution of intention). On Scenic Avenue (one of the streets) curbs were already in on both sides of the street, and the roadway covered the full width of the street. Some of the pavement (specifically excepted in the resolution of intention) was already constructed, and the said resolution provided for the balance thereof. On the other street (Fifth Avenue) there was a curb on both sides for about eighty feet north of Scenic Avenue, and additional curbing on one side thereof for the remaining balance of the street; and it was this gap in the curbing (earlier herein referred to as a prolongation thereof) that was provided for in these proceedings. The question of the width of a street where the same is definitely shown on the plans can only become important when it is claimed that some of the work to be done lies outside of the lines of what in fact is public property. Otherwise the only purpose of showing widths is to locate the work so that property owners may have notice of the extent of the contemplated work. In the present case all the work done was definitely within the lines of what the evidence shows, and what we have already affirmed was public property dedicated to the public use.

▮ As a further alleged separate ground of invalidity appellants contend that the inclusion of ten side sewer connections in the work of improvement fronting on their property and the consequent assessment therefor was an act

at once so arbitrary and unreasonable in its nature as will result in depriving them of their property without due process of law. This claim is based upon the fact that the property owned by them and subject to this assessment is now held by them in one large unsubdivided parcel, of which they have no immediate intention of subdividing into lots requiring the sewerage facilities in question, and on that account they maintain that the city council's action in thus requiring them at this time to pay for facilities for which they have no immediate use is arbitrary and will result in compelling them to pay an unwarrantedly large sum of money therefor. Upon examination, however, we find that less than five per cent of appellants' total assessment, or $278, is attributable to the inclusion of these sewers. Moreover, the nature and extent of proposed works of improvement is one which has been by the legislature committed to the sound discretion of the city council, and its decision in such respects is ordinarily conclusive. (*Duncan* v. *Ramish,* 142 Cal. 686 [76 Pac. 661].)

We are of the opinion that it may not be fairly held as a matter of law that the act of a city council in requiring sewer connections at intervals of fifty feet along an improved street in a city so advantageously located to the near-by metropolis of San Francisco as is San Rafael, and which will undoubtedly in the near future derive a substantial growth in population as a result of the construction of the "Golden Gate Bridge" (definitely contemplated at the date of these proceedings but now in active course of construction), spanning San Francisco Bay and linking the two cities by direct rail connection, is on its face arbitrary and oppressive. By ordering the immediate construction of these sewers the council, of course, avoided the necessity of having its streets torn up on some future occasion when the need for their construction would be pressing. In speaking of the powers of a similar board to order the construction of sewers our Supreme Court said:

"It is their province to determine whether sewers are needed, and what districts will be benefited thereby. Upon these points their judgment is ordinarily final. And there may have been, in the judgment of the board, *other reasons why this sewer should be thus constructed, although it*

*would not be at once utilized.''* (*Harney* v. *Benson,* 113 Cal. 314, at p. 317 [76 Pac. 661]. Italics ours.)

Another claim of alleged invalidity advanced by appellants against the proceedings is the failure of the city council to include within the assessment district certain property adjacent to the said improved streets but situated on sides thereof opposite to the property of plaintiffs. This claim is without merit. It sufficiently appears that the property owners so situated had previously at their own expense constructed in front of their property improvements which were of the nature of those provided for on the opposite sides of the street in the instant resolution of intention. Naturally they received the benefit of exclusion from assessment in the present proceedings. Such exclusions (on account of work previously done and paid for) are matters of frequent occurrence in street work proceedings. Moreover, it has been repeatedly held that in the absence of fraud the boundaries of an assessment district are a matter to be determined exclusively by officials of the city under authority delegated to them by the legislature. (*Beale* v. *City of Santa Barbara,* 32 Cal. App. 235, 242 [162 Pac. 657]; *Harney* v. *Benson, supra; Duncan* v. *Ramish, supra.*) Appellants in the present case did not charge fraud; nor did they contend that their property was not benefited by the work; nor is there any evidence that the charge for the work is excessive when compared to the value of the property assessed (of which there is no substantial evidence).

A still further ground of objection urged by appellants is that a certain specification limiting the asphalt required in the performance of the work to a California product thereby unduly restricted competition. This claim was advanced in the trial court, which permitted evidence to be received on the issue, and which determined it adversely to appellants' contention. It was there shown that bitumens are found in great quantities throughout this state, and that many firms dealt in California asphalt. An expert testified that practically all similar pavements in this state were constructed of such asphalts and there was no monopoly in its use. It was further shown that the use of foreign products would be more expensive (which alone would justify the specification). This evidence was entirely sufficient to establish that competition had not been restricted

by reason of the limitation, and that the cost of the work had not been increased thereby. The trial court's reception of such testimony on the determination of an issue of this character was a course tacitly approved by the reviewing court in *Thoits* v. *Byxbee*, 34 Cal. App. 226, 232 [167 Pac. 166], in its disposition of a similar matter.

Of a similar nature to appellants' last above considered claim are their further claims that certain specifications calling for grades of rock "known locally as Nos. 2 and 4" were so uncertain as to restrict competition and thereby increase the cost of the work. Upon these issues the trial court again took testimony showing that these classifications relate merely to the size of the rock as established by the openings in screens generally used in the locality, and the size of such screens was a matter easy of ascertainment without expense. This evidence was not contradicted; nor did it appear that any contractor or property owner was misled as to what was intended thereby. Contractors are deemed to bid with some knowledge of local conditions. In *Shepherd* v. *Chapin*, 45 Cal. App. 645, 649 [188 Pac. 571], a specification was held sufficiently certain that provided for "sound trap rock or granite composition equal to the gravel found in the San Joaquin River" which was obviously less easy of ascertainment than the simple matter of finding out the size of a screen in general use locally, which was alone involved in complying with the instant specifications.

Of similar import to appellants' last reviewed claims are their objections to a specification providing that "The gratings shall be of good gray cast iron, similar to the standard 18"x18" grating manufactured by the P. David Company, and shall weigh not less than 130 pounds." It was shown on the trial that the P. David grating was *not* a patented design; that a blue-print of the same was on file with the city engineer, and that while the words "P. David Co." were merely those of convenient description, as the same had been used generally in San Rafael, nevertheless any 18x18 grating, weighing 130 pounds, of good gray cast iron, would comply with the specification. This, because the size and weight are given, and the use of the word "grating" implies openings. Any variation in the number of openings would not affect the cost, the weight of the metal being given. Although we hold the specification itself suffi-

ciently certain, and that the same did not result in increasing the cost of the work or restricting competition, it would seem that the practice of referring in such specification to a product by its trade name (unless it be a patented article offered equally under the usual license agreements, at a uniform price to all contractors) is subject to the just criticism that it savors of an attempt on the part of city employees to indirectly favor the manufacturer thereof by giving undue prominence to his product.

Having carefully considered each of the several objections made by appellants to the street improvement proceedings in question, and finding no one of them of such substantial merit as would warrant a reversal of the decree entered in the court below, the judgment appealed from should be affirmed, and it is so ordered.

Knight, Acting P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 13, 1933, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 11, 1933.