**LIVESAY** et al. v. DROLET et al.
Civil Action No. 121–M.

District Court, S. D. Florida.

March 3, 1941.

886

Price & Price, of Miami, Fla., for plaintiffs.

T. J. Dowdell, of Miami, Fla., for defendants.

HOLLAND, District Judge.

This cause having heretofore come on for trial upon the issues presented by the pleadings herein, and the parties having introduced and produced testimony and proofs before the special master, and the master having made findings, the Court makes the following Findings of Fact and Conclusions of Law, to-wit:

Findings of Fact

1. The Court approves the findings of the special master appointed under Rule 53 of Federal Rules of Civil Procedure for the District Courts of the United States, 28 U.S.C.A. following section 723c.

2. This is a patent infringement suit brought by Everett Grey Livesay and Livesay Window Company, Inc., a corporation organized and existing under the laws of the State of Florida, against Emmet O. Drolet and Leigh C. Drolet, individually and as co-partners doing business as Drolet Precast Window Company, of Miami, Florida, alleging infringement of Letters Patent No. 2,166,870, issued to Everett Grey Livesay on July 18, 1939.

3. Everett Grey Livesay is the lawful owner of the patent in suit; and the Livesay Window Company is exclusive licensee under said Letters Patent.

4. Everett Grey Livesay came into the Miami area prior to October 7, 1937, and engaged in the sale and installation of Venetian blinds. He found in the buildings he examined most of the walls were of poured concrete or preformed concrete blocks, steel sash frames and sash of the casement type being installed in window openings. This necessitated the Venetian blinds being of the non-flapping type involving the installation of blind guides engaged by anchor pins on the ends of the blinds, inasmuch as when casement sash is open at all, it opens entirely from the top to the bottom of the window. The window casement and blind installations were imperfect and generally unsatisfactory. Very few of the window openings were plumb at the sides or level at the top or bottom. The steel sash was distorted or bent from a true plane and few of the blind guides were the same distance apart from top to bottom or parallel to one another with respect to the plane of the steel sash. Few Venetian blinds would fit the window opening or the guides for which they were sized without being altered. This was largely due to the prevailing method of construction which called for successive steps of installation performed by different groups of workmen. The masons were not always careful in forming the window openings. The carpenters who secured wooden strips or "bucks" on opposite sides of the window opening to receive the sash were not always careful to see they were parallel and one would sometimes extend above the

other; and the sash frame, although originally parallel and lying in a true plane when installed against the wooden blocks which were not parallel, would be twisted to conform to the bucks. Furring strips nailed one on each side of the window opening on the inside of the wooden bucks to receive blind guides were subject to the same inaccuracies as the wooden bucks. The blind guides were next installed in such a manner so that their surfaces would be flush with the plaster when applied. If the sash frame was crooked, it was very difficult to determine just where the plaster surface would be; and the blind guides had to be built away from the furring strip so as to bring their surface into the plane of imaginary surface of the plaster and usually had three blocks inserted beneath the guides which meant the guides were inadequately supported between the blocks. The guides during the plastering operation were subject to various abuses, and as a result were generally not parallel. In time cracking of the wall around and below the sash installation would distort the steel sash producing a generally unsatisfactory condition. Steel sash frames several years old rusted and corroded, making it necessary to paint periodically. This necessitated removal of the frames which could only be done by chipping away the stucco on the outside and the plaster on the inside.

5. Livesay conceived of casting a monolithic four-sided reinforced concrete window frame of such strength and rigidity that it would resist any distortion through unequal pressure and protect a steel frame and sash within the surround, the monolithic concrete frame or surround to be of such strength that if the wall settled so as to cause a tilt of the monolithic frame, it would tilt as a whole without any change in the right angle relationship of the four integral sides and parts within the frame.

Livesay further conceived of the casting of the monolithic four sided surround in combination with a precisely located window seating rib and with precisely located blind guides so as to have these members originally correlated with factory precision, and to maintain these members in the same relationship throughout the life of the building shielded from wall strains by the rigid resisting strength of the monolithic concrete surround. This resulted in providing an integral factory fabricated window frame unit including in combination a monolithic concrete protective surround structure or trim, with means within the bounds of said surrounding structure, precisely relatively located both initially and perpetually for accurately and removably mounting a metallic window sash frame and for accurately guiding an associated Venetian blind.

6. The precast monolithic window frame met with immediate acceptance. From a modest beginning in 1937, the dollar sales have increased until in the first four months of 1940, there was a dollar sale of $30,927.04, with a total sale for the last three years of $142,000. Only $1,200 has been expended in advertising.

Architects and builders have never heard of such construction prior to Livesay, and now recommend its use in preference to others. Inquiries were received from twenty states, South Africa and Japan, and requests for manufacturing franchises from some sixteen states.

7. After the plaintiffs had placed their product on the market, one of the defendants, Emmett O. Drolet, who was engaged in the sale of metal sash, discussed the Livesay precast monolithic frame with the witness, Helvey, on the Dabney job, in October of 1937, and stated that he did not think precast monolithic frames were practical. In the fall of the same year, he visited plaintiff's plant, obtaining estimates on Livesay precast frames. In February, 1938, defendants produced a similar monolithic precast concrete frame, as exemplified by Plaintiffs' Exhibit 13, and continued to manufacture and sell said frames with knowledge that Livesay had applied for Letters Patent and in the face of threats of legal action upon the issuance of the patent. The manufacture of the monolithic precast frame as exemplified in Plaintiffs' Exhibit 13, was subsequent to the early conception and manufacture by the plaintiff of similar frames, as illustrated by Plaintiffs' Exhibit 3, and, as far as the record shows, such manufacture by the defendants was not a result of any knowledge or concept on the part of defendants prior to the manufacture by Livesay of such frames in June, 1937, and as between the defendants and plaintiffs, the plaintiff Livesay was the original inventor.

Variations of the blind guide installations were subsequently used as shown in Plaintiffs' Exhibits 9 and 10, but in every cast the fundamental concept of invention was retained, and defendants used or sold all

three forms after the issuance of the patent in suit.

8. In Plaintiffs' Exhibit 9, the monolithic frame is precast with recesses at the sides defining longitudinal shoulders, the function of which is to precisely allocate Venetian blind guides which the said recesses are designed to receive and which blind guides are actually secured in said recesses against said shoulder both at the plant or on the job. The forming of the recess and the placing of the blind guide therein against a shoulder or rabbet held by mastic and nails, is the equivalent of the blind guides being imbedded in the precast frame and serves the same function in substantially the same way by substantially the same means.

9. Claims 1, 2, 3, and 4 of the patent in suit read on Plaintiffs' Exhibits 9, 10 and 13, and are infringed by the manufacture, use and/or sale of such structures.

10. The defendants have pleaded the following patents as anticipatory of the patent in suit, all of which were considered by the Patent Office and the patent granted after such consideration:

| | | |
|---|---|---|
| Niss | 444,302 | January 6, 1891 |
| Smith | 984,611 | February 21, 1911 |
| Kennedy | 991,517 | May 9, 1911 |
| Robertson | 238,452 | British of Aug. 20, 1925 |
| Weaver | 2,087,941 | July 27, 1937 |

The patent to Niss, No. 444,302, Defendants' Exhibit 2, describes a Venetian blind construction of the non-flapping type and is not directed to any particular type of window frame. It shows incidentally an ordinary four piece wooden frame in which the Venetian blind is mounted. The sill A-2, lintel A', and jambs A, are presumably nailed together, and it discloses no sash frame.

Such construction is no stronger at the corner than the frictional hold of the nail in the wood and any stress would tend to change the angularity of the frame and correspondingly distort and throw out of alignment anything supported by or within the frame. No monolithic concrete frame with a seating surface is present and there are no Venetian blind guides imbedded in the opposite sides of such a concrete frame. Such construction will not serve the same purpose nor give the same result in substantially the same way as the patent in suit.

11. The patent to Smith, No. 984,611, Defendants' Exhibit 3, describes a metal window construction adapted to be mounted in an opening in a wall and assumes that changes in the shape of the window opening will occur. It provides spring plates H between the channels B and the window sashes so that they will work properly notwithstanding the deformation in the shape of the wall opening. There is no monolithic concrete frame and no metal sash frame seated against the monolithic frame, but a metal lining consisting of three separate pieces independently anchored to the two sides and the top of the wall opening. There is no bottom member and this cannot be called a frame. No rib is present for seating the sash frame. Anchoring means c' are imbedded in the wall and three independent plates, consisting of two side plates and a top plate, are secured directly to the wall by said anchoring means. The purpose of the Smith patent is to mount independent metal side and top plates directly into a wall opening for obscuring as little as possible of the light area of said opening and providing tolerance between the sash and the plate to accommodate any change which the window opening and metal plates which are attached thereto may undergo through unequal settling of the wall. The purpose is entirely different and does not give the same result as the patent in suit.

12. The patent to Kennedy, No. 991,517, Defendants' Exhibit 5, and the patent to Weaver, No. 2,087,941, Defendants' Exhibit 4, have no bearing on the patent in suit. The first shows an anchoring bolt in cement; the second, a blind guide constructed so that the edges are curled outwardly and away from each other to conceal any shrinkage in the plaster.

13. The British Patent to Robertson, No. 238,452, Defendants' Exhibit 6, describes a window frame composed of four light, separately cast, concrete members joined at the corner by a tongue and groove or by dowels. The frame is put together piece by piece on the job, the sill being laid on the wall and a sash frame positioned on the sill acting as a temporary support for the jambs "g" placed on opposite sides of the frame. The wall is then built up against the outside of the jambs to the top level of the sash frame and the lintel then put in place. The form is then put above the lintel and concrete poured in to form a head or supporting wall. No mono-

lithic concrete window frame, including sides, sill and lintel, is shown, the sides, lintel and sill being held rigidly solely by masonry built around them. If distortive movements occur in the wall the four separate members being keyed into the wall must move with the wall portion, and must, therefore, break or distort at the joints. No Venetian Blind guides are imbedded in the monolithic frame. The Robertson frame is attended by all the mechanical inaccuracies which the invention of the patent in suit is designed to avoid.

13–A. It is very significant that the defendants have copied the plaintiffs' frame rather than make use of the patents set up in the answer which are said to constitute the prior art. The defendants are free to use the structures shown in the prior patents, so that the enforcement of an injunction granted herein cannot injure the defendants in such use. On the other hand, the failure to enforce an injunction would deprive the plaintiffs of the benefits secured to them by the patent.

14. Alleged prior knowledge of the invention by the witness Pospicil was uncorroborated by other witnesses and consisted principally of oral testimony based on the recollection of the witness and blueprints, Defendants' Exhibits 8 and 9 and so-called publications, Defendants' Exhibits 7 and 7–A. Defendants' Exhibits 7 and 7–A contain no disclosure bearing on the patent in suit and the blueprints, Defendants' Exhibits 8 and 9, are not the best evidence. Neither the original drawing nor the person making it were produced and no satisfactory explanation was made of their absence, nor do Defendants' Exhibits 8 and 9 disclose a monolithic concrete surround, nor do they disclose the invention defined in the claims of the patent in suit. Witness Pospicil, a manufacturer of alleged infringing frames, is an interested witness, and was indefinite as to persons and places of installation and fails to meet the burden of proof in such cases that the evidence must be clear, convincing and beyond a reasonable doubt. The witness after claiming to have made concrete frames in 1932 in Michigan, came to Miami in 1934 and in spite of the great need and demand for the invention in suit, failed to build a precast concrete window frame until 1938, which was subsequent to Livesay's invention. These frames constituted four pieces, separate heads, jambs and sills, and no monolithic frames were built until after witness Pos-

picil was familiar with plaintiffs' construction. The public demanded the monolithic precast window frames, and since the spring of 1939, the witness has made only monolithic frames. If witness Pospicil made any precast frames prior to coming to Miami, they failed to show the inventive concept of the patent in suit, and at best were nothing more than an abandoned experiment.

15. The various defenses pleaded by the defendants are without merit, and the Livesay Patent, No. 2,166,870, issued July 18, 1939, is valid and infringed.

## Conclusions of Law

1. The issuance of the patent carries with it a presumption of invention and validity which must be overcome by the defendants with proof as absolute as in a criminal conviction.

2. A departure from what is old and the imitation of the patented structure by defendants who deny invention, has been regarded as conclusive evidence of what defendants think of the patent and proof of what the rest of the world ought to think.

3. If the invention has filled the long felt want and advanced the arts substantially, the court is liberal in its construction of the patent.

4. Commercial success, although not conclusive of invention is highly persuasive, especially when the prior art shows no success along the same lines.

5. The fact that the inventive concept was not discovered nor practiced prior to Livesay although there was a definite need, is strong evidence of invention.

6. A new combination of old elements or devices whereby a new and useful product is produced or an old product is attained in a more efficient and economical way may be protected by a patent. It constitutes no anticipation and no defense to a claim of infringement that one or more elements of a patented combination, or one or more parts of a patented improvement, may be found in one old patent or publication, and others in another, and still others in a third. It is indispensable that all of them, or their mechanical equivalents be found in the same description or machine, where they do substantially the same work by the same means.

7. Structure designed merely for the purpose of avoiding the spirit of the in-

vention, but which contains all of the elements of the claims or their equivalents, are infringements of the patent.

 8. Change of location of an element of a combination if the function remains the same, will not avoid infringement.

 9. If two devices do the same work in substantially the same way and accomplish substantially the same result, they are the same even though they differ in name, form or shape.

10. One who sells an article capable of being installed in an infringing manner which contributes materially to the installation or use of the article in an infringing manner whether the contributing conduct be direct or indirect, is guilty of contributory infringement.

11. Combination patents would generally be valueless in the absence of the right to equivalents, for few combinations now exist or can hereafter be made which do not contain at least one element an efficient substitute for which can readily be suggested by any person skilled in the particular art.

12. An anticipation must be clearly proved and all reasonable doubt must be resolved against the defendant.

13. The proof must be as absolute as in a criminal conviction and the existence of doubt defeats anticipation.

14. Anticipation must be in such full, clear and exact terms as to enable anyone skilled in the art or science to which it appertains to make, construct or practice the invention to the same practical extent as would the patent sought to be invalidated.

15. There must be a complete. concept of the invention by the prior user in order to constitute anticipation. Accidental results, not intended and not appreciated, do not constitute anticipation.

16. The cooperation of the means necessary to create an invention is to be measured by the purpose to be fulfilled not by the interaction of the parts. Each factor must indeed be a condition to that result but the whole may be a mere assemblage. The cooperation between them all may be no more than their necessary presence in a unit where it answers a single purpose.

17. One who appropriates the substance of a patented invention without

the consent of the patentee does not escape infringement by improving upon or subtracting from the invention as long as the essential elements are retained.

18. The patent in suit is valid and defendants have infringed Claims 1, 2, 3 and 4 by making, using and/or selling structure similar to Plaintiffs' Exhibits 9, 10 and 13.

19. Plaintiffs are entitled to their prayers for relief, and defendants should be enjoined in accordance therewith.