[No. 30653. Department Two. May 13, 1949.]

THE CITY OF SPOKANE, *Respondent*, v. THE CATHOLIC BISHOP OF SPOKANE, *a corporation sole, Appellant.*[1]

[1]Reported in 206 P. (2d) 277.

*Royce & Hurley*, for appellant.

*G. M. Ferris*, *B. A. Farley*, and *Paul F. Schiffner*, for respondent.

ROBINSON, J.—On June 4, 1928, the defendant purchased, for twenty-five thousand dollars, a parcel of land in the city of Spokane (Tract A on the accompanying map) as a site for a new grade school and pupils' playground.

In 1940, a brick school building was erected thereon, which now accommodates more than five hundred children. The adjacent playground is in constant use by these children. For their protection against traffic hazards, the grounds have been enclosed with a wire fence. When the erection of this fence, long delayed by difficulty in obtaining materials during the war, was completed in 1947, the city council of Spokane directed the corporation counsel to commence this action, in which it is claimed that the city is entitled to

an easement for a street (Tract B) across defendant's property. Plaintiff seeks an injunction requiring the removal of that portion of the fence preventing access to the claimed street. The trial court held that the injunction should be granted. From this holding, defendant has appealed.

Title to all of the property here involved was formerly vested in Sylvester Heath, who, prior to the turn of the century, owned, in addition, much of the land contiguous thereto. He subsequently sold many of his holdings, but retained the whole of the block shown on the map as being bounded on the north by Nora avenue, on the south by Mission avenue, on the east by Dakota street, and on the west by Standard street. He built a home on the southern portion of the property, and surrounded the entire block with a fence. Some time around 1900, this fence was removed, and a path or roadway, rudimentary prior to this time, grew up, starting from Dakota at a point slightly to the north of the intersection of Augusta avenue, running across the length of Tract B and terminating at a point opposite the intersection of Augusta and Standard. In 1905, or thereabouts, a fence was constructed across the property, along a line to the south of this path or roadway.

On October 6, 1905, Sylvester Heath and Ida E. Heath, his wife, prepared and executed a plat of certain of their property in the vicinity, including the block here involved, and dedicated four specifically designated and described tracts to the public "as highways." Two of these were Tract C, at the present time in use as an alley, and Tract B. In 1909, the Heaths sold two adjacent lots, each abutting on the north line of Tract B and on the south line of Tract C, one to Torrance and one to Samuel. It appears that these two lots subsequently came into the hands of one owner, Samuel, who built a house thereon, fronting on Tract B. The present owner of this house is not among those seeking an injunction, and is not involved in this litigation in any way.

In 1910, Heath, Torrance, and Samuel joined in the composition of the following letter:

"To the Board of Public Works and City Council of the City of Spokane, Washington.

"Gentlemen:

"The undersigned, Owners of property fronting upon Augusta Avenue between Dakota & Standard, respectfully petition your honorable body to cause a plan to be made

of said street giving street grade so sidewalk and curb may be put in according to the City Charter.

"J. N. Samuel

"Edgar A. Torrance—2006 E. Courtland Ave.

"S. Heath"

The city council complied with this request. By direction of the board of public works, the city engineer prepared a "Plan and Profile of Augusta Avenue from Dakota Street to Standard Street." This plan was submitted to the council, which thereupon passed ordinance No. A5144, establishing the grade of the street. The plan included specifications for a street sixty feet wide, and for a curb and sidewalk to run along either side. This curb and sidewalk have never been built as planned. At the present time, the only curb and sidewalk along the length of the tract consist of one hundred feet in front of the former Samuel home. These closely conform to the specifications in the plan, but Mr. Garnett, who has worked in the city engineer's office since 1909, testified that, as far as he knew, they were not put in by the city, and that, if they had been so put in, he should have known of it.

Meanwhile, the testimony indicates that the public was continuously using the road, as well as the entire area between the fence and Tract C, excepting, of course, the Samuel property, without interference from Sylvester Heath, or his successors in interest. On April 7, 1928, the appellant entered into a contract with Mary V. Heath, the surviving second wife of Sylvester Heath, for the purchase of Tracts A and B and the premises north of Tract B and south of Tract C, save and except the Samuel property. June 4, 1928, Mary V. Heath executed a warranty deed to the premises hereinabove mentioned, to the appellant.

Respondent admits that these facts are not sufficient to constitute a statutory dedication of Tract B. It is contended, however, (1) that they show a valid common-law dedication, enforcible against the appellant; and (2) that they further indicate that the city acquired an easement by prescription in the tract, through adverse user, either during

the ten-year period beginning in 1905, or, in the alternative, during the ten-year period beginning in 1928.

We will first examine the claim of common-law dedication. Under proper circumstances, such a dedication may be established without the production of any written document to support it, and respondent introduced much evidence suggesting that the instant case presents a situation of this kind. However, in order to show that the Heaths, in 1905, actually executed a plat dedicating Tract B to the city, it introduced two blueprints, apparently made from the original of the plat and found in the files of the city engineer. The two blueprints are identical, except that, on one, Mission avenue is shown as narrower than it is on the other; the second, on which Mission avenue is broader, bears the written approval of the city engineer. Both cover the same area; both contain the words of dedication; both include a written acknowledgment by a notary public. We think respondent's explanation of the discrepancies between them is entirely satisfactory. It is as follows:

"It is apparent from an examination of the exhibits that Exhibit No. 5 was the first print taken from the original tracing, because it is clearer and unblemished; whereas, it is obvious that Exhibit No. 6 was a print taken from the tracing after it had been folded. It is reasonable to assume that Exhibit No. 5 was tendered to the city engineer and found to be unacceptable, because Mission Avenue was shown to be but 50 feet in width. Thereafter, the tracing was changed to provide full width for Mission Avenue and the plat was accepted."

Appellant objected to the introduction of these blueprints, and, the trial court having admitted them, it assigns error on the point. We think, however, that they are clearly admissible, either as ancient documents themselves, or as sufficiently authenticated copies of a lost or unobtainable ancient document. They fulfill the three conditions to which such documents must conform in order to authorize their introduction under the exception to the hearsay rule here in question: (1) They have been in existence for a period of over thirty years, having been purportedly exe-

cuted in 1905, and being marked with a file number indicating that they were in the city engineer's files at least in 1912 or 1913; (2) They came from proper custody, since it would be entirely natural to find documents of this type in the files of the city engineer; (3) in appearance they are free from suspicion, being obviously of considerable age.

It is true that, as blueprints, they must be considered copies, and therefore secondary evidence. *Livesay v. Drolet*, 38 F. Supp. 885. However, diligent, but unsuccessful, search for the original was made in the city engineer's office, and in the office of the city clerk, the two places where, it being admitted that the plat is not filed in the county auditor's office, it would be expected to be found. There can be no doubt that the original plat existed, because there can be no blueprint without such an original. That this original was an authentic document was shown by the identification of the signatures of Sylvester and Ida Heath, and of that of the notary public who took the acknowledgment, and by testimony indicating that Charles MacIntyre, who apparently approved the original in his capacity as city engineer, in fact, occupied that position in 1905.

Further, and most important, the contents of the blueprints are thoroughly corroborated by other evidence in the case, as will appear as we proceed. We therefore hold that the blueprints were properly admitted, and we hold, in addition, that, whether admitted as ancient documents or as properly authenticated copies of a lost or unobtainable ancient document, the recitals therein may properly be employed to evidence the truth of the facts recited. See Wickes, Ancient Documents and Hearsay, 8 Tex. Law Rev. 451, in which it is demonstrated that the majority of courts correctly take a similar view.

It is apparent that, when all the evidence is considered, it is amply sufficient to sustain respondent's contention that there was a complete common-law dedication of the roadway in question by Sylvester Heath and his wife. In *Seattle v. Hill*, 23 Wash. 92, 62 Pac. 446, it was said that there are two things necessary to a valid dedication, (1) an intention on the part of the owner to devote his land, or

an easement in it, to a public use, followed by some act or acts clearly and unmistakably evidencing such intention; and (2) an acceptance by the public. As to the first requirement, it was said, in *Corning v. Aldo*, 185 Wash. 570, 55 P. (2d) 1093:

"Dedication originates in the voluntary donation of the owner or seller, and when the intention of the owner to dedicate is clear, manifest, and unequivocal, whether by a written instrument or by some act or declaration of the owner manifesting his clear intent to devote the property to public use, it becomes effective for that purpose. *Shell v. Poulson*, 23 Wash. 535, 63 Pac. 204."

Sufficient intent to dedicate is satisfactorily established by the statements in the blueprint plats themselves; and other circumstances in the case support these statements and give them further weight. Thus, the Heaths allowed the public to travel freely over that portion of their land shown to be dedicated, a relevant factor. *Seattle v. Hill, supra*; *Seattle v. Hinckley*, 67 Wash. 273, 121 Pac. 444. They sold two lots abutting on the north line of the tract, and on the south line of Tract C, though concededly without reference to either as a street; and they built a fence running parallel to the south line of the tract. Finally, an intention to dedicate may be further inferred from Heath's joining in the petition to have the city council establish a grade. See *Ball v. Tacoma*, 9 Wash. 592, 38 Pac. 133. All these facts tend unmistakably to point to the conclusion that the Heaths intended to dedicate their property, and, we think, are more than sufficient to establish firmly the existence of such an intent.

That the dedication was accepted by the city seems equally apparent. Acceptance may arise (1) by express act; (2) by implication from the acts of municipal officers; and (3) by implication from user by the public for the purposes for which the property was dedicated. 4 McQuillin, Municipal Corporations (2d Rev.) 773, § 1704. Here, there was no express or formal act of acceptance. However, the action of the city council, in passing an ordinance establishing the street grade, particularly when it was taken in

response to a request that this be done "so sidewalk and curb may be put in according to the City Charter," was such an act from which acceptance by the municipality might be implied. See *St. John v. King,* 130 Cal. App. 356, 20 P. (2d) 123. And the long-continued use by the public of the tract as a road further suggests that an acceptance was made. The fact that the amount the road was used, and the state of development it reached, were matters of dispute, is immaterial. As we said in *Loose v. Locke,* 25 Wn. (2d) 599, 171 P. (2d) 849:

"Nor is it necessary to show that the road has been used by any considerable number of persons. It is sufficient to show that those persons who might naturally be expected to enjoy it have used it to their pleasure or advantage. *Reinhardt v. Chalfant,* 12 Del. Ch. 214, 110 Atl. 663; *Phillips v. Stamford,* 81 Conn. 408, 71 Atl. 361, 22 L. R. A. (N.S.) 1114; *Taraldson v. Town of·Lime Springs,* 92 Iowa 187, 60 N. W. 658."

See, also, *Spencer v. Arlington,* 49 Wash. 121, 94 Pac. 904; *Seattle v. Hinckley, supra.*

We further said, in *Corning v. Aldo, supra:*

"User, if actual and continuous, need not be for any fixed time, because it is not a matter of prescription merely, but one of acceptance of the grant."

Thus, user by the public for seven years was held to be sufficient to indicate acceptance in *Okanogan County v. Cheetham,* 37 Wash. 682, 80 Pac. 262, 70 L. R. A. 1027. We think that, by 1910, when the city council passed the ordinance establishing the street grade, this fact, combined with user by the public until that time, was sufficient to show that an acceptance by the municipality had been made. It is apparent, therefore, that the Heaths completed a valid common-law dedication, rendering themselves or their grantees with notice powerless to question the rights of the municipality in Tract B. *Horton v. Okanogan County,* 98 Wash. 626, 168 Pac. 479.

A careful examination of the record, however, discloses that the appellant's position here was quite different. There is nothing to indicate that, at the time of its purchase, it had any notice whatsoever that a common-law dedication of

part of the property had ever taken place. In the contract between Mrs. Heath and the appellant, and in the deed executed by her and filed in the office of the county auditor, the property was described as follows:

"That part of West Half (W½) of Southeast Quarter (SE¼) and Southeast Quarter (SE¼) of Southwest Quarter (SW¼) of Section Eight (8), Township Twenty-five (25) North, Range Forty-three (43) E. W. M., bounded and described as follows: Beginning at a point 100 feet east of the southeast corner of Block Forty-seven (47), Heath's Fourth Addition to Spokane Falls (now Spokane), thence north 542 feet; thence east 300 feet; thence south 142 feet; thence east 100 feet; thence south 400 feet; thence west to place of beginning."

No special mention is made of the area here designated as Tract B, and there is no suggestion that the city or anyone else had any right or title thereto. The testimony of one of appellant's witnesses, though somewhat ambiguous, indicated that, subsequent to 1934 at least, the city records showed that "the property was one big piece of land that was in the name of the school," and that no street was indicated thereon. There is no contention that any instrument evidencing a dedication in any way was ever filed with the county auditor.

The case, therefore, comes within the rule that an unrecorded dedication is unenforcible against a bona fide purchaser. This result has been reached in several cases involving both written and oral dedications, upon the theory that dedication operates as an estoppel *in pais* against the dedicator, and that, as was said in *Green v. Miller*, 161 N. C. 24, 76 S. E. 505, 44 L. R. A. (N.S.) 231:

"The same general principle of equity that raises the estoppel will protect him, as an innocent purchaser, from its operation; and this is but just and right."

See, also, *Phillips v. Laguna Beach Co.*, 190 Cal. 180, 211 Pac. 225; *Sexton v. Elizabeth City*, 169 N. C. 385, 86 S. E. 344; *Schuchman v. Borough of Homestead*, 111 Pa. St. 48, 2 Atl. 407; Note, 42 Harv. L. Rev. 837.

But, at least where the dedication is evidenced by a written document, the same result may be reached on the better theory that a dedication operates like a grant. Under this view, the bona fide purchaser is protected by the recording statutes. Note, 10 Cal. L. Rev. 419. See *Lind v. Bellingham*, 139 Wash. 143, 245 Pac. 925. That the plat from which the blueprints were made in this case is the foundation of the dedication with which we are concerned, can hardly be doubted. It is true that the blueprints show nothing indicating that the city council made an express acceptance of the plat. However, it was "approved" by the city engineer. "Approved" for whom, if not for the city council? In adition, subsequent acts of the municipal authorities show a knowledge of this dedication. In passing the grading ordinance, the city council, as well as the abutting owners, seems to have assumed that it was in control of the tract. Furthermore, the plan of the street, prepared by the city engineer as a basis for this ordinance, as respondent itself says, "corresponded exactly with the plat and must have been made with reference thereto." Finally, as additional evidence that the city authorities at this time were aware of the written dedication, it is noteworthy that a sewer was constructed along Tract C, also dedicated in the plat in question.

Under these circumstances, the language of *Cunningham v. Norwegian Lutheran Church*, 28 Wn. (2d) 953, 184 P. (2d) 834, is pertinent:.

"From the beginning, we have held without deviation that a bona fide purchaser of real property may rely upon the record title. In *Beckman v. Ward*, 174 Wash. 326, 24 P. (2d) 1091, we cited a number of cases, and we have since affirmed that principle on numerous occasions."

See, also, *Napier v. Runkel*, 9 Wn. (2d) 246, 114 P. (2d) 534, 137 A. L. R. 175.

In *Lind v. Bellingham*, 139 Wash. 143, 245 Pac. 925, plaintiff had purchased certain lands without being aware that they had previously been dedicated to, and accepted by, the city. On appeal, it was held error for the lower court to

have excluded testimony tending to establish the purchaser's good faith, since:

"The recording statutes are applicable to municipalities as well as to private individuals, and the rule is that a person purchasing real property may rely on the record title to the property, in the absence of knowledge of title in another, or of facts sufficient to put him on inquiry."

However, as is suggested by the above quotation, it is quite generally held that, where there is an apparent dedication to public use, or where such a dedication may be inferred or suggested from the condition of the property, the purchaser is put on notice and cannot defeat the right of the public therein, should such right in fact exist; and this is so regardless of the state of the record title or of the recitals in his deed. *Schuchman v. Borough of Homestead, supra; Bellar v. City of Beaumont* (Tex. Civ. App.), 55 S. W. 410; *Lind v. Bellingham, supra.* It is therefore necessary to determine whether the condition of the property was such as to amount to constructive notice to the appellant that Tract B had been dedicated, thereby depriving it of its status as a bona fide purchaser.

All the testimony indicates that, prior to its employment by appellant as a playground, the entire area of Tract A, north of the wooden fence, was little more than a vacant lot, on which anyone could come and go as he chose. In the early days, cows were herded on it. Later on, neighborhood boys held baseball and football games there. Children "played all over the place." One witness testified that, at one time, there was an additional roadway, coming through the property from Nora avenue, which was used by wagons, though other witnesses recalled no such roadway. In any case, the bulk of the evidence was in accord with the following testimony given by one of respondent's witnesses on cross-examination:

"Q. Talking about the whole piece of property, isn't it a fact that people around there, it being open and uninclosed property, just came and went as they pleased? A. Anybody could cross when Heath was there, I know that. Q. Anybody could cross when Heath was there? A. In the south

portion of it. Q. I am not talking about the house, I am talking about the north half of the property. A. North of the house? Q. And people came and went as they chose? A. That was an orchard there, and they could walk across. Q. Nobody ever said they couldn't? A. No. Q. And there were several paths that went in various directions and crisscrossed there? A. Yes."

Although most of this testimony referred to the years prior to the first world war, there is no suggestion that the condition of the lot generally was changed in any way subsequent to that time, and prior to the establishment of the playground. With this in mind, it is pertinent to consider the status of Tract B during this period.

Photographs submitted by the respondent indicate that, at the present time, Tract B is occupied by a roadway which, though unpaved, is in excellent condition, being broad and level, and entirely suitable for use by all types of vehicles. Testimony as to the condition of this road prior to 1928, however, is in sharp conflict. Thus, one witness testified that the city first graded the street in 1911 or 1912, and that it was graded like other streets in the vicinity from then on. Colonel Orndorff, however, testified for the appellant that, in 1913, the road was not a direct road, but was "nothing but a winding trail through what would be an extension of Augusta Avenue." He stated further that, at that time, "there was nothing established or graded about it." As for later years, a witness, employed by the city as a grader driver, testified that he graded the roadway several times every year from 1926 to 1942. Another witness, on the other hand, in the course of a discussion of the condition of the northern half of Tract A generally, testified as follows:

"Q. What was it prior to the time that the school was built there, do you remember? A. It was just a vacant area. Q. Do you remember whether or not there were any passageways there, driveways, or anything traversing it in any direction? A. There was an old cow trail through here, it was there, a rather crooked thing, and in bad weather it was in bad condition. I don't think in my thirty years of driving I have driven through there thirty times, because it was in no condition to go through there prior to 1930."

Father O'Mally, who negotiated for the purchase of the property on behalf of the appellant, testified to this effect:

"Q. Father O'Mally, at the time that you purchased this property you had an opportunity to look it over before you purchased it? A. Yes, and the bishop drove around and walked around it. Q. You were familiar with the property long before that? A. I passed by there several times. Q. Did you see any paths or roadways running through it? A. Nothing but a trail, and I object to calling it a street. It never was a street. Q. What did it look like? A. It looked like rather a rough road, used by those who availed themselves of it, something like a trail running through the property, around potholes here and there. Q. At the time that you purchased the property, did the trail, as you call it, have any regular route through the property? A. No. Generally just east and west. Q. Did it leave the property at any certain place? Did the roadway leave the property on Dakota or Standard at one place? Did it have any designated entrance into the property? Did the road begin on the one side and continue straight through? A. It just followed the ground, wherever it was easier, the trail was more or less marked. Q. At that time did it appear to you that the road had ever been graded? A. No, it certainly was not."

Taken all together, and allowing for the numerous contradictions, we do not believe that the above evidence conclusively discloses that the condition of the property in 1928 was such as to suggest to a purchaser the existence of a dedicated street along Tract B. The roadway was established during a period when Spokane was growing. At such times in the development of cities, paths, ways, and roads furnishing convenient short cuts across vacant lots are frequently established and used by sufferance of the owners of the legal title. "It would not occur to any one that these trails or ways of convenience were intended as streets or alleys." *Maggs v. Seattle*, 74 Wash. 323, 133 Pac. 388. For many years, the owners of Tract A had allowed the public to use its northern portion indiscriminately. In our opinion, the appellant's representatives would have been entirely justified in regarding the road along Tract B as merely another manifestation of the use which Mrs.

Heath permitted the public to make of the whole section of her property. It is true that the hundred feet of sidewalk and curbing along the front of the Samuel house might at first seem to suggest that the city had exercised some dominion over the tract; but, when it is noted that this construction terminated at the exact end of the Samuel property, the inference is logical that it was the result of private endeavor, which, in fact, some of the evidence suggests was actually the case.

A similar situation was presented in the case of *Phillips v. Laguna Beach Co.*, 190 Cal. 180, 211 Pac. 225. There, a park had been dedicated to the public and used by it for many years. Two pavilions and some steps had been built on the property. The dedication, which was unrecorded, was held invalid as to a college which had made a loan on, and accepted a deed of trust to, the property, although representatives of the college had previously inspected the park. The court said, of the pavilions and steps:

"As to them there was nothing to show that they were for public use or that they were anything other than private erections on the part of the premises on which they stood."

We think the same reasoning may be applied to the curb and sidewalks in the instant case.

Further, had the appellant been stimulated by the condition of the property to make further investigation as to the status of Tract B, the evidence indicates little likelihood that he would have learned of the city's rights in it. No official map of the city of Spokane, as far as could be determined, ever showed Tract B as a street. The whole of Tract A, including Tract B, was regularly assessed for taxes as a single unit, and taxes were levied and paid upon that basis. Though we think that the municipal authorities unquestionably knew of the dedication of the property in 1910, their attitude toward it in 1927 can be inferred from the following letter, written by the commissioner of public works, a member of the city council, to the city council in connection with a planned special assessment for certain improvements:

"June 30, 1927

"President & Members
of the City Council.
"Gentlemen:
"Find transmitted herewith Clerk's file No. 31232, petition of property owners for grading, curbing and sidewalking Dakota Street, from Indiana Avenue to Mission Avenue, together with plans and specification for same, map and description of assessment district, preliminary assessment roll, grade ordinance, and Ordinance providing for the improvement. . . .

"Your attention is called to what would be Augusta Avenue west of Dakota Street, and the Alley between Nora and Augusta Avenues west of Dakota Street. This street and alley are in use as a street and alley; also there is a sewer in the Alley. *However, we have treated them both as private property and have assessed them for this improvement, as we find that the owner is paying taxes upon both street and alley.* (Italics ours.)

"Respectfully,
"DEPARTMENT OF PUBLIC WORKS.
"/s/ LEONARD FUNK
Commissioner."

In 2 Walsh, Commentaries, Law of Real Property, 501, § 219, Professor Walsh states:

"In all cases of indirect notice from facts inducing inquiry, including notice from possession, if the subsequent purchaser investigates the matter as fully as could be expected of the average man without discovering the existence of the prior instrument, or such investigation would necessarily have failed, he is a purchaser in good faith and without notice."

■ We think this language applicable to the present case. It is our conclusion, therefore, that it would be both inequitable and against the weight of the evidence to charge the appellant with constructive notice of the common-law dedication of Tract B as a street; that, this being the case, it must be considered a bona fide purchaser of the property, against whom that dedication, being unrecorded, may not be enforced; and that, consequently, as to appellant, it is a nullity.

Respondent next claims that it has an easement in Tract B, arising out of a ten-year adverse user commencing at or about the end of the year 1905. Clearly, however, this contention cannot be sustained, as, long prior to 1915, public use of the property had ceased to be adverse. The acceptance of the dedication gave the municipality the right of possession, and it consequently cannot be said that subsequent use by the public was hostile to anyone. A comparable situation, and its consequences, are discussed in 4 Tiffany, Real Property (3rd ed.) 507, § 1177, in connection with the problem of acquisition of title to land by adverse possession, as follows:

"The recording acts protect a bona fide purchaser only as against a prior instrument which might have been, but was not, recorded, and there is no obligation upon one who has acquired title by adverse possession to retain the possession in order to charge a subsequent purchaser with notice of his rights. But if one in wrongful possession of land, before the end of the limitation period, obtains a conveyance from the true owner, his possession should thereafter, it seems, be regarded as based on the conveyance, so that, if he fails to record it, a subsequent bona fide purchaser will acquire a superior title, although, if the person in possession had not received the conveyance from the true owner, he would, by the running of the statute of limitations, have acquired a title superior to that of the subsequent bona fide purchaser. Having obtained a deed from the rightful owner, his possession ceases to be wrongful, and the statute runs only in favor of a wrongful possession."

See, also, Note, 26 Harv. L. Rev. 762.

■ The acceptance of either a written or parol dedication seems entirely analagous to the delivery of a deed, since in either case an effective conveyance is completed thereby. That, in our view, the evidence indicates that acceptance in this case was perfected by 1910, and that this acceptance must have been made pursuant to, or at least with knowledge of, the written offer, has been previously shown. Upon such acceptance, therefore, it is plain that adverse user by the public ceased before the expiration of the ten-year period. The city's easement in Tract B thus came into existence by virtue of express written grant,

rather than by prescription, and, consequently, as has been demonstrated, it was subject to the operation of the recording acts. Certain statements in *Seattle v. Hinckley*, 67 Wash. 273, 121 Pac. 444, might be interpreted as tending to support a different conclusion, but such statements, in any event not necessary to the decision in that case, are not in accord with a logical and sound interpretation of the word "adverse."

 Respondent's final contention is that, even if it did not acquire an easement by prescription in Tract B prior to 1928, it did so during the ten years subsequent to that time. It bases this claim on the undisputed fact that the public continued to use the road without hindrance, and the further fact that the city maintained the road in good condition during the period in question. But, as we have pointed out, Tract A, south of the fence, was a vacant lot, which had been customarily used by all of the public prior to appellant's purchase. There was no evidence to indicate that, at the time of the purchase or for some time thereafter, the appellant had knowledge of any special claim of right made by the public to Tract B. Father O'Malley testified:

"Q. Had you at any time while you were pastor of the parish there, prior to the time that you purchased the property, *or after the time you purchased the property*, hear any claim made by any person, individual or corporation, or anyone, to the right of a roadway across there at any time? A. No. Q. You heard none asserted? A. I never heard it." (Italics ours.)

There was testimony that the city sprinkled and oiled the street, and that it was graded several times a year; but we do not think this conclusive notice to the appellant of the city's claim, as it might be expected that maintenance crews, in going from Augusta avenue on the west to Augusta avenue on the east, would pass over this section, which furnished a convenient short cut. In fact, the grader, who testified that he had worked on the road, stated that, though the city engineer customarily directed him to the district in which he was to work, he himself selected the

particular streets to be worked on. In addition, the city continued to assess the property, though, as it was used in connection with a school, no taxes were actually collected, and official maps continued to appear which did not show this street. We think it clear that the appellant allowed the public to cross its property by sufferance, and that, this being true, the case is brought within the principles set forth in *State ex rel. Shorett v. Blue Ridge Club*, 22 Wn. (2d) 487, 156 P. (2d) 667, as follows:

"We held in *Northwest Cities Gas Co. v. Western Fuel Co.*, 13 Wn. (2d) 75, 123 P. (2d) 771, that an easement of right of way across the land of another, including even the establishment of a public highway over private property, may be acquired by prescription, but that prescriptive rights are not favored in law since they necessarily work corresponding losses or forfeitures of the rights of other persons; and that the burden of proving the existence of a prescriptive right rests upon the one who is to be benefited by the establishment thereof. We said that, when one enters into the possession of another's property, there is a presumption that he does so with the true owner's permission and in subordination to the latter's title; that a user which is permissive in its inception cannot ripen into a prescriptive right, no matter how long it may continue, unless there has been a distinct and positive assertion by the dominant owner of a right hostile of the servient estate; that there is no presumption that use has been adverse where the lands in question are vacant, open, uninclosed, and unimproved. In such cases, mere use of the land of another will not, of itself, give rise to the presumption that the use has been adverse; that is, courts do not, in such cases, infer adverse user but require evidence of facts or circumstances indicating that the user was indeed adverse and not permissive.

"In *Scheller v. Pierce County*, 55 Wash. 298, 104 Pac. 277, we held that where the use (as in the case at bar) is permissive in its inception, then such permissive character, being stamped on the use at the outset, will continue of the same nature and no adverse user can arise until a distinct and positive assertion of a right hostile to the owner, and brought home to him, can transform a subordinate and friendly holding into one of an opposite nature, and exclusive and independent in its character.

"There was no act by any one, either the public or public officials, that could be designated hostile or an act which would put the appellant on notice that the use was intended to be under claim of right. *That the use in the case at bar was presumed to be permissive at inception, is substantiated by the character of the property and the fact that the public use of it did not in any way interfere with the owner's use. From the very beginning, appellant and its predecessors in title knew of and did not object to the public's use of the two tracts so long as no malicious injury was done to the property.*

". . . An owner is not required to adopt a dog-in-the-manger attitude in order to protect his title to his property." (Italics ours.)

See, also, *Roediger v. Cullen,* 26 Wn. (2d) 690, 175 P. (2d) 669, and cases therein cited; *Dugan v. Zurmuehlen,* 203 Iowa 1114, 211 N. W. 986. Decisions such as *King County v. Hagen,* 30 Wn. (2d) 847, 194 P. (2d) 357, may be distinguished on the ground that the nature of the property involved and the testimony presented in those cases did not support an inference that use by the public had ever been permissive, but, instead, tended to substantiate a contrary conclusion.

While, under proper circumstances, a city may well enforce its right to a road without showing or proof that the road is beneficial to its citizens, in deciding a case such as this a court of equity will give some consideration to the inconvenience and damage that will result to the defendant, as well as to the benefits that will accrue to the plaintiff, should the injunction be enforced. The cost of the land here involved to appellant was $25,000; the cost of its school was $52,000. Mr. Shaw, the superintendent of schools of Spokane School District No. 81, stated that, in his opinion, an elementary school of five hundred pupils should have at least five acres for its site, and that efforts were being made by the school and park board to see that the various public high schools in the city were allotted this much land. He testified further, as follows:

"Q. I will ask you for your opinion, Mr. Shaw; based upon your knowledge, experience and upon the opinion of educators as you know it, can an elementary school with a

playground adjoining, for upwards of 500 children, what would you say in regard to the open maintenance of a public highway across the center of that playground, whether that would destroy or seriously impair the usefulness of the property for playground purposes? . . . A. My opinion is that wherever possible there should be no conflict with the playing area. For the purpose of safety for the children in carrying on the kind of game that should be carried on as a part of the physical education program."

Such a conclusion would seem fairly obvious. On the other hand, respondent's need for the street has not been convincingly demonstrated. Several witnesses testified that, particularly in former years, they used nearby, paved streets in preference to it. At best, this road seems to have offered the public a useful short cut.

Considerations of this kind would not, of course, justify a refusal to grant the relief prayed for, if the right to it were clear, but, where the right, as in this case, is more than doubtful, they afford proper grounds for denying a remedy which produces such extremely serious consequences to the appellant, with little or no corresponding benefit to the respondent. *Loomis v. Collins,* 272 Ill. 221, 111 N. E. 999.

With due deference to the thoughtful and well-considered opinion of the trial court, we must nevertheless hold that under all the circumstances of the case, the decree should be reversed, the injunction set aside, and the cause dismissed. It is so ordered.

MALLERY and SCHWELLENBACH, JJ., concur.

SIMPSON, J. (concurring specially)—I should now, as is my custom when I am satisfied with the result obtained by the majority, acquiesce silently in its opinion did I not believe that certain holdings of the majority relative to the introduction of evidence violate rules of evidence that have stood the test of time since members of the bench and bar began to be conscious of evidence as a distinct field of law.

It is my contention that the blueprints, exhibits Nos. 5 and 6, were not admissible in evidence to show a dedica-

tion by former owners of the property, because they were not the best evidence and were not properly identified.

Proof of a fact demands the production of the best evidence obtainable. If a legal contest involves the contents of a written instrument, that instrument must be produced with evidence proving its execution. If the instrument cannot be produced, secondary evidence may sometimes be admitted.

The rule may be stated as follows: The best evidence of the contents of a written instrument is the instrument itself, which must be produced, or a satisfactory cause shown for its nonproduction. Its production will be excused only in case of necessity, as where it is shown to be lost, destroyed, stolen, beyond the jurisdiction of the court, or in the hands of the opposite party who fails to produce it on notice. In the absence of such proof, neither oral evidence nor copies of the writing may be received. In either event, there must be proof of the execution of the original writing and its delivery, when delivery is necessary.

"Where proof is to be made of some fact which is recorded in a writing, the best evidence of the contents of the writing consists in the actual production of the document itself. Any proof of a lower degree is secondary evidence which will be received as proof only where nonproduction of the writing is properly accounted for. The contents of a written instrument may not, as a general rule, be proved by parol, unless the failure to produce the paper itself is accounted for. The principle is controlling in every case wherein it is sought to prove the contents of written instruments of any kind whatsoever." 20 Am. Jur. 366, Evidence, § 406.

"Where a party seeks to introduce secondary evidence of the contents of documents, and as a foundation for the introduction of such evidence relies on the fact that the original writings have been lost or destroyed or are inaccessible to him, see supra §§ 823-831, he must first establish this fact. The same rule applies where it is sought to introduce secondary evidence of the contents of public or corporate records." 32 C. J. S. 766, Evidence, § 837.

The supreme court of the United States in *United States v. Boyd,* 46 U. S. 29, 12 L. Ed. 36, held that secondary proof of the contents of a letter of appointment should not have

been received without first accounting for the nonproduction of the original.

The case of *United States v. Castro*, 65 U. S. 346, 16 L. Ed. 659, had to do with the claimed title to eleven leagues of land in California under a Mexican grant. A paper purporting to be the original grant was deposited in the government archives of the United States more than three years after its date and two years after the cession of the territory. It was not deposited by the grantee, Castro, but by one McKenzie, whose representatives claimed a portion of the land under a conveyance from Castro. The grant was signed by Pio Pico, then governor of California, and Jose Matias Moreno, secretary pro tem. Their handwriting was proved by a single witness. However, no testimony was offered to show when or where the paper was executed; nor was there any testimony to show who had custody of the grant until it was deposited in the public archives. Nor was there any reason given for keeping it out of the public office for so long a time; nor testimony as to how McKenzie obtained possession of it, except by the deed from Castro which he produced at the same time. The supreme court said in passing:

"In order to maintain a title by secondary evidence, the claimant must show to the satisfaction of the court: 1st, that the grant was obtained and made in the manner the law required, at some former time, and recorded in the proper public office; 2d, that the papers in that office, or some of them, have been lost or destroyed; and, 3dly, he must support this proof by showing, that within a reasonable time after the grant was made, there was a judicial survey of the land, and actual possession by him, by acts of ownership exercised over it. . . .

"We repeat again these rules of evidence, because it would seem from the case before us that the board of land commissioners and the Circuit Court regard written documentary evidence, produced by a claimant from a private receptacle, and proved by oral testimony, as of equal authenticity and entitled to equal respect with the public and recorded documents found in the public archives. But such a rule of evidence is altogether inadmissible. It would make the title to lands depend upon oral testimony, and consequently render them insecure and unstable, and ex-

pose the public to constant imposition and fraud. Independently, therefore, of the strong presumptions against the authenticity of the paper produced as a grant, it cannot upon principles of law be maintained, even if the testimony produced by the claimant was worthy of belief."

In *Dwyer v. Dunbar*, 72 U. S. 318, 18 L. Ed. 489, it appears that Dunbar brought suit against Dwyer on certain notes given by Dwyer. The defendant offered a copy of a letter which he claimed showed a compromise of the indebtedness. The letter itself was not produced, and there was no proof given of its loss. The court held that the evidence was entirely secondary in character, and that the trial court was correct in refusing its admission.

In the case of *Marsh v. Wade*, 1 Wash. 538, 20 Pac. 578, this court said:

"It may be stated in passing, also, that a cardinal principle of evidence, unchanged and unchanging, is that parol, contemporaneous evidence is inadmissible to contradict or vary the terms of a valid written instrument; and that when the terms or contents of a written instrument are the subject of inquiry, the instrument itself, if in existence and capable of being produced, is the only proper evidence. This is elementary."

The trial court in *Rauh v. Scholl*, 12 Wash. 135, 40 Pac. 726, permitted a paper to be given in evidence which purported to be a copy of an assignment of lease. The signatures to the copy were typewritten, and the signature of the notary before whom the acknowledgment of the original was taken was not attached to the copy until the same was offered in evidence upon the trial. In announcing its rule this court said:

"But, in any view of the case, this purported copy was wholly inadmissible under the circumstances attending its reception in evidence, because no foundation had been laid; no notice to produce the original had been given. To lay a foundation for the introduction of secondary evidence of the contents of a writing, the party offering the same must show that he has done all in his power to produce the original."

At the trial in *McGill v. Fuller & Co.*, 45 Wash. 615, 88 Pac. 1038, the court excluded secondary evidence of the contents of the letter which had been received in evidence on a trial of an attachment suit. The only foundation laid for the admission of the evidence was an examination of the files in that action. The court said: "This showing was wholly inadequate, and there was no error in the court's ruling."

In *Bond v. Werley*, 175 Wash. 659, 28 P. (2d) 318, this court approved the action of the trial court in rejecting copies of notes because they were merely secondary evidence, and there was no satisfactory explanation of the failure to produce the originals.

The statement of the rule as announced in *Marsh v. Wade*, *supra*, was approved in *Smith v. Johnson*, 2 Wn. (2d) 351, 98 P. (2d) 312.

The proof offered by respondent in this case was to the effect that blueprints are not originals, but are copies made by a photographic process. Photographs of documents are not admissible unless there is proof that (1) there were in fact executed original documents; (2) the original documents were lost, stolen, or otherwise unobtainable; (3) they are accurate photographs or copies of the originals. They may not be admitted when they are not accompanied by proof of their authenticity.

*United States v. Braden*, 92 F. (2d) 682, is in point. In that case, error was assigned upon the action of the trial court in excluding from consideration by the jury certain exhibits numbered 1 and 2. Those exhibits purported to be photostatic copies of the applications of the veteran for the insurance policies issued to him by two insurance companies. Their appearance indicated that the original applications were signed by the veteran and contained answers to certain questions which the opposing party regarded as relevant to the issues involved. No excuse was given for failure to introduce the original applications, and there was no evidence that the purported copies were really copies thereof. The circuit court held that the trial

court did not commit error in excluding the proposed exhibits.

There was no evidence to show that Mr. and Mrs. Heath, who owned the property, signed the alleged written document which purported to dedicate the property in question to the public. There is a complete lack of evidence to prove delivery of the original writing. The exhibits, Nos. 5 and 6, were placed at random somewhere in the city engineer's office. There are no filing marks on them to indicate in any way that they were considered as official documents. Let us assume, however, for argument's sake, that the Heaths did dedicate this piece of ground; there is no evidence in the record which indicates that the authorities of the city of Spokane were ever apprised of the dedication, or ever accepted it.

"The authority to open, repair, and improve streets . . . was conferred upon the city of Seattle by its charter, and, as the city council was the only body by which the authority could be exercised, it follows that it was empowered to accept dedications of streets on behalf of the public." *Seattle v. Hill,* 23 Wash. 92, 62 Pac. 446.

"A dedication at common law, like a contract, consists of an offer and acceptance; and subject to some exceptions considered, below, the general rule is well settled that a dedication is not binding and conclusive on either party until acceptance, and, of course, this rule applies to the grantee of the party offering to make the dedication. A dedication without acceptance is, in law, merely an offer to dedicate, and such offer does not impose any burdens nor confer any rights. Until acceptance, the public acquires no rights, and is subject to no duties by reason of the dedication, and the rule has been applied in cases where it was sought to charge the public with responsibility for the care and maintenance of streets and highways dedicated to public use. Obviously, the owners of property cannot for their own benefit or convenience impose a street or highway on a municipality against its will and compel it to improve the street or highway or keep it in repair. In applying these rules, there is no distinction between a dedication by an individual and a muncipality." 26 C. J. S. 93, Dedication, § 34 a.

"A dedication of land to the use of the public, whether express or implied, may be revoked at any time before it has been accepted. [Citing case.] It has also been held, and upon sound ground, that a conveyance of an unaccepted street or highway revokes the dedication. [Citing cases.] It may also be revoked by applying the highway to any permanent use inconsistent with the purpose of the dedication." *Smith v. King County*, 80 Wash. 273, 141 Pac. 695.

In any event, there was not a legal dedication proven. The city did not prove that Mr. and Mrs. Heath signed the alleged dedication agreement, and there was no acceptance on the part of the city, or move by the city to accept the property, which demonstrates that there was never any thought in the minds of the members of the city government that this piece of land had been dedicated to public use. There being no proper dedication of this street, the city's claim fails entirely.

There was insufficient evidence to prove an easement by prescription.

The majority opinion seems to indicate that a court of equity will decide a case of this nature in favor of the party that will suffer the greater injury by an adverse decision. In so doing, they call attention to the cost of the land. I cannot agree with that statement. A man's necessities never ripen into a right.